2021 IL App (1st) 200858-U

THIRD DIVISION
September 8, 2021

No. 1-20-0858

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF JOHNNIE LARUE, | ) ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) ) | Cook County. |
|     Petitioner-Appellee, | ) ) | |
| | ) | No. 11 CR 8002601 |
| v. | ) ) | |
| Johnnie LaRue, | ) ) | Honorable Peggy Chiampas, |
|     Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not abuse its discretion in declining to give respondent's proposed jury instruction; (2) the trial court did not abuse its discretion in limiting defense counsel from cross-examining the State's experts about the risk values related to respondent's score on actuarial instruments; (3) respondent forfeited his additional claims related to cross-examination by failing to raise them in his posttrial motion; and (4) the evidence was sufficient for the jury to find beyond a reasonable doubt that respondent was a sexually violent person.

¶ 2 Following a jury trial, respondent Johnnie LaRue was found to be a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq*. (West 2016)) and following a dispositional hearing, respondent was committed to the custody of the Department of Human Services (DHS). Under the SVP Act, a person may be found to be an SVP after having been convicted of a sexually violent offense and is found dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence. 725 ILCS 207/5(f) (West 2016).

¶ 3 On appeal, respondent argues that: (1) the trial court erred in denying to instruct the jury with defendant's proposed instruction regarding burden of proof; (2) the trial court denied him a fair trial by precluding him from fully cross-examining the State's witnesses; and (3) the State failed to prove that he was an SVP beyond a reasonable doubt.

¶ 4 In 2011, the State filed a petition to commit respondent as an SVP under the SVP Act. In the petition, the State alleged that respondent had been diagnosed with paraphilia not otherwise specified and a personality disorder not otherwise specified with antisocial and narcissistic features, and that these mental disorders were congenital or acquired conditions affecting respondent's emotional or volitional capacity which predispose respondent to commit acts of sexual violence. In May 2013, the trial court conducted a probable cause hearing and following the hearing, the court found probable cause for the SVP proceedings.

¶ 5 Prior to trial, the State filed a motion *in limine* seeking to preclude respondent and his witnesses from using any testimony, questions, or argument on several topics, including an "attempt to define 'substantially probable' as it used in the Illinois SVP Act as any numerical percentage or in any way other than 'much more likely than not'." At a hearing, respondent objected to the State's request and following argument, the trial court granted the State's request

over respondent's objection. The court noted that it would instruct the jury "as to what substantially probable means."

¶ 6    Also during pretrial proceedings, respondent filed a request to ask the venire several proposed jury questions for *voir dire*, including the following question:

> "Evidence that Mr. LaRue was convicted for or committed sexually violent offenses before committing the offense on which the petition is based is not sufficient by itself to establish beyond a reasonable doubt that Mr. LaRue has a mental disorder. Is there anyone who does not understand and accept this legal principle?"

The trial court allowed this proposed jury question with no objection from the State.

¶ 7    The following evidence was presented at respondent's March 2019 jury trial.

¶ 8    Dr. Vasiliki Tsoflias testified as an expert in clinical psychology, specializing in sex offender evaluations. She was employed as a forensic and clinical psychologist with Wexford Health Sources (Wexford). Wexford has a contract with the State of Illinois to complete SVP evaluations, which Dr. Tsoflias conducts.

¶ 9    Dr. Tsoflias was assigned to evaluate respondent in August 2011. She reviewed his Department of Corrections master file, medical file, police reports, and court documents prior to an interview. She interviewed respondent in October 2011 to talk about his criminal history and background information to aid in the diagnosis and assess his level of risk. She explained the purpose of the interview to respondent, and he indicated his understanding and agreed to participate in the interview. The interview lasted approximately three hours and 15 minutes. She prepared a report summarizing her evaluation in November 2011.

¶ 10    After completing her evaluation, Dr. Tsoflias concluded that respondent met the criteria under the SVP Act to be considered an SVP. She updated her report in March 2015 because a new version of the Diagnostic and Statistical Manual of Mental Disorders (DSM) was released and she wanted the original diagnosis to meet the standards of the new DSM. The new version is DSM-V and was still in operation at trial. She did not interview respondent for her amended report because no additional information would be warranted by an interview. Respondent was not attending treatment, and nothing would have been significantly different for her diagnosis. Her opinion in the updated report was that respondent continued to meet the SVP criteria.

¶ 11    Dr. Tsoflias updated her report in April 2018 because the risk changes when an individual turns 60 years old. Since respondent had turned 60, she completed a new risk assessment, but did not interview him for the same reasons as in her previous updated report. Her opinion was that respondent continued to meet the criteria of an SVP.

¶ 12    She considered respondent's criminal history in formulating her opinions. She learned his most recent conviction was from 1985, which occurred while he was on parole for a prior rape. Respondent was 28 years old when committed to the Department of Corrections in this case. Respondent was visiting someone at the Cook County Jail and the victim was visiting the same person. Respondent had known the victim for years prior to that day. After the visit, they went to a bar across the street and split a beer. Later, when they were walking behind the jail, respondent pulled the victim down behind a cement partition. He hit her head on the cement partition, choked her, and forced her to engage in vaginal sex.

¶ 13    Dr. Tsoflias asked respondent about this offense during the interview, and he told her that the victim had previously said she would have sex with him on his birthday. At the bar following the visit at the jail, respondent reminded her that she said she would have sex with him for his

4

birthday, but she told him that she did not want to have sex with him. He then became aggressive and they started wrestling. He admitted that he penetrated her vaginally and performed oral sex on her. He initially stated that she hit her head on the cement partition as she was trying to run away, but later he said he accidentally hit her head as he was pulling her down. He stated that the victim would not have turned him in, but a friend of hers convinced her to report the rape. Respondent said the victim knew that sex was not a big deal and if she had not told him that she would have sex with him on his birthday, then none of this would have happened. Respondent told the doctor twice during the interview that he was not intoxicated during the offense.

¶ 14    Dr. Tsoflias also discussed respondent's other convictions. He was convicted for a 1979 rape and armed robbery and was sentenced to concurrent terms of 10 years for the rape conviction and 10 years for the armed robbery. Respondent was 22 years old when he committed this crime. Respondent entered the victim's apartment at approximately 9:45 p.m. while she was sleeping in her bedroom and her daughter was sleeping in her respective bedroom. Respondent got into the victim's bed and held a knife to her throat. The victim initially thought it was her boyfriend and told him to stop and to leave her alone. Respondent responded something similar to, "B***, this isn't your boyfriend." Respondent then asked the victim if she'd ever had anal sex before. He then forced her to have vaginal sex and to perform oral sex on him at knifepoint.

¶ 15    While the victim was struggling with respondent, she had an asthma attack and told him she needed to get her medicine or she could die. Respondent followed her to the bathroom to get her inhaler. While she got her inhaler, she saw respondent's face in the bathroom mirror. After she took her medicine, she continued to struggle with respondent in which he hit and punched her. He then asked how to exit her apartment and she directed him to the back stairs. Respondent then

dragged her down the back stairs with him. While in the victim's apartment, he stole a change purse.

¶ 16    A few days later, respondent was caught peeping in the window of another female who lived nearby and was seen by witnesses who approached him. During a physical struggle, respondent was stabbed three times in the chest.

¶ 17    When asked about sexual assault during the interview, respondent said the case was "bogus." He admitted that he entered the apartment to rob her, but could not find anything to steal. He touched the victim's arm to see how deeply she was sleeping. She woke up, started screaming, and had an asthma attack. He helped her get her medicine. When the doctor asked why he was charged with a sexual offense, respondent answered that it was because he was on parole for a prior sexual offense and they added those charges. Dr. Tsoflias reviewed a report from another evaluation in which respondent told the clinician that he entered the apartment and saw her sleeping in bed. As he was attempting to pull down the victim's underpants, she woke up hysterical and started screaming.

¶ 18    Dr. Tsoflias discussed defendant's conviction for rape in 1976 for which he received a sentence of four years in the Department of Corrections. In that case, respondent entered the victim's home at approximately 6 a.m. while the victim was asleep in bed. He woke her and sexually assaulted her at gunpoint. He told her he would kill her if she did not submit. He then fled and took her gun, her watch, and $78. Respondent told Dr. Tsoflias that he was coming home from the club and was "buzzing." He entered the home to rob her, but saw her sleeping so he decided to get into bed and have sex with her.

¶ 19    Respondent also described his sexual history to Dr. Tsoflias. He stated that at the age of six, he began a sexual relationship with a same-age female cousin that continued until they were

14. He stated that in his lifetime, he has had a total of 100 sexual experiences, 30 during adolescence and 70 as an adult. He denied that any of the partners were prostitutes, but most were "one night stands." He admitted that he had cheated on girlfriends to have sex with other women. He stated that he had sex on a daily basis. Dr. Tsoflias noted that this was significant because respondent "was not in the community for a significant period of time because he was incarcerated for the majority of his adult life."

¶ 20 Dr. Tsoflias noted that respondent had prior arrests, including a felony related to the Illinois Vehicle Code, criminal damage to property and other robberies. Cases in which respondent was arrested but not convicted were relevant because it showed a pattern of his behavior. According to her, "[i]t's more important to see how they act and assess a pattern of their behavior."

¶ 21 Dr. Tsoflias also relied on respondent's disciplinary history while incarcerated. He received approximately 100 disciplinary tickets while incarcerated for his most recent offense. Four of the tickets involved a component of sexual misconduct, but he was only found guilty of two for sexual misconduct, for the other two, he was found guilty of intimidation, threats, and insolence. He previously received a ticket in 1997 for sexual contact with another inmate. Respondent told her he had sexual contact with a prior cellmate, but the ticket was not for sexual contact with the other inmate. Respondent said that the correctional officer made up the offense because the officer wanted to get rid of his cellmate who was gay.

¶ 22 Respondent received a sexual misconduct ticket in approximately 1999 for sending a sexually explicit letter to his 14-year-old niece. Dr. Tsoflias learned that in 2000, respondent's brother wrote a letter to the warden stating that respondent was writing sexually inappropriate letters to his 14-year-old daughter. He asked the warden to help him bring charges against respondent and that respondent no longer be able to contact his family. Respondent had been

harassing his brother's family and his daughter was scared. Portion of two sexually explicit letters were read into evidence.

¶ 23    Dr. Tsoflias testified that the letters were relevant to her risk assessment of respondent. She noted that if the letters were sent in the community, respondent could have been formally charged with an offense. The letters also showed poor sexual boundaries because even though he was incarcerated for a sexual offense, he was still acting out inappropriately in a sexual manor. Respondent was punished for these letters with a year in segregation and had one year of good time credit revoked. Respondent told her during the interview that it was a misunderstanding and he was not talking about what he would do to his niece, but was letting her know how young boys might talk to her if they wanted to have sex with her.

¶ 24    She also read a disciplinary report from 1998 written by an intern. She heard someone call out to her, "hey blondie, I want to f*** you up the a**," but kept walking. Later, respondent approached her and said he had called her blondie. On another occasion, respondent walked with her through the facility and kept telling her that he wanted to talk to her, and she inspired him. He followed her to her office. When she left her office, he was still there. She told him to leave her alone. He was found guilty of intimidation, threats, and insolence.

¶ 25    Another disciplinary report from 1991 involved respondent making a comment to a female correctional officer that he was going to "grab her and kiss the s*** out of her." Respondent wrote a letter to the chair of the disciplinary committee and stated that he joked with the correctional officer a lot and this was just a joke.

¶ 26    Respondent told Dr. Tsoflias that he attended eight months of sex offender treatment, but left because the people were just talking about their sex offenses and were not working on why they were offending. When asked why he did not seek treatment at another correctional center,

respondent said he did not attend treatment because he felt like some people in that program were still engaging in deviant behavior and he did not want to be a part of it. He has never participated in treatment at his current facility.

¶ 27     She discussed treatment concepts that generally help those engaged in treatment to understand the reasons why one would offend sexually. When she asked respondent about the concepts, he gave "pretty vague answers." When she asked what would stop him from reoffending, respondent said he would have to face his problem. She asked him to expand on that explanation, but he was unable to expand. Respondent could not provide any coping skills other than saying if he felt the urge, then he would masturbate instead.

¶ 28     Dr. Tsoflias also considered respondent's substance abuse history, but noted that his report of substance use had been inconsistent. He told her used marijuana, but never used alcohol on a regular basis. In his documents, there were prior reports stating that he drank on a daily basis as well as reports of his use of cocaine and heroin. He did attend of 240 hours of substance abuse education and treatment.

¶ 29     For her opinion, Dr. Tsoflias relied on the DSM-V. She diagnosed him with other specified paraphilic disorder (OSPD), sexually attracted to nonconsenting females in a controlled environment. The controlled environment portion of her diagnosis specified that respondent was in a controlled environment and not free in the community. She explained that paraphilia, under the DSM, is "when there is intense and persistent sexual arousal to, basically, nonconsenting adult partners. So if there's sexual arousal to something other than that or other than preparatory fondling to engage in sexual acts with a consenting adult partner, that would be a paraphilia. It rises to the level of a paraphilic disorder when the sexual attraction to whatever else it is causes harm or risk of harm to someone else." She further described respondent's diagnosis:

"for a period of at least eight years, he engaged in nonconsensual sexual acts with at least three women. During these acts, he either used a weapon or physical force, in addition to threats, to have the women submit to sexual acts with him. And by engaging in this behavior and by threatening them and by using a weapon, he caused harm to the victims."

¶ 30    She also diagnosed him with other specified personality disorder with antisocial and narcissistic features. This personality disorder meant that respondent "has aspects of antisocial personality disorder and narcissistic personality disorder, but I could not diagnose him with either of those. So he has aspects of both of those disorders that interfere with his ability to -- that interfere with his behavior on a day-to-day basis and his daily functioning." In order to diagnose someone with antisocial personality disorder, there has to be evidence of conduct disorder prior to age 15, but Dr. Tsoflias did not have enough reliable information about respondent's life and behavior prior to age 15. She did find some aspects, which included: (1) a failure to conform to social norms as shown by him repeatedly engaging in acts that were grounds for arrest; (2) deceitfulness, lying or manipulating others for his personal gain; (3) reckless disregard for the safety of self and others as shown by respondent's acts of sexual violence and physical violence as well as impulsivity.

¶ 31    For narcissistic personality disorder, respondent showed aspects that included: (1) a lack of empathy, including empathy for his victims and minimizing his behavior and its impact on the victims; (2) being interpersonally exploitative, which means using people for your personal gain; and (3) a sense of entitlement.

¶ 32    Dr. Tsoflias explained that how respondent's personality disorder affected his paraphilic disorder.

"[T]he aspects of the personality disorder make it more likely that he's going to act

10

on the paraphilic disorder. So if he gets -- when he gets the urges to act out sexually, because he has these aspects of his personality -- where he doesn't think about the consequences, he's impulsive, he doesn't have empathy for the victims -- that makes it more likely that he's going to act out on these urges."

¶ 33    These conditions are chronic and are either congenital or acquired conditions, meaning he was either born with these conditions or acquired them at some in his life due to environmental or external factors. The conditions impact the way he regulates or handles his emotions and interfere with the way he makes decisions. The disorders predispose him to commit acts of sexual violence because when he has these sexual urges, he is more likely to act on them without thinking about the victim or the consequences of the behavior.

¶ 34    Dr. Tsoflias also conducted a risk assessment for respondent. She used two actuarial instruments in her evaluations, the Static 99-R and the Static 2002-R, to assess respondent's risk of reoffending compared to other sex offenders. On the Static-99R, respondent scored a 5 which placed him in the above average risk category and was 2.7 times more likely to engage in a future sex offense than a typical sex offender who received a score of 2. On the Static-2002R, respondent scored a 5 which placed him in the above average risk category and made him 1.9 times more likely than a typical sex offender to reoffend.

¶ 35    She also found several dynamic risk factors present in her evaluation of respondent, including, sexual preoccupation, an interest in sexualized violence, lifestyle impulsivity, lack of intimate relationship with an adult, grievance thinking, minimizing his acts and offenses, and a minimization of his responsibility. She also found a case-specific factor of callousness or lack of empathy for others because he does think about the effects of his actions on his victims.

¶ 36    Dr. Tsoflias further considered protective factors that would reduce respondent's risk.

These include: (1) having been in the community for a significant amount of time without offending; (2) less than 15 years of future risk due to increased age or a significant medical condition; and (3) having completed a cognitive behavioral treatment program. She found that none of these factors applied for respondent. He was never completed a sex offense treatment program.

¶ 37    In her opinion, it is substantially probable that respondent would engage in future acts of sexual violence. Dr. Tsoflias explained that substantially probable meant "more likely than not." Respondent suffers from a mental disorder that makes it substantially probable that he would engage in future acts of sexual violence and he met the criteria necessary to be found an SVP under the SVP Act.

¶ 38    During cross-examination, Dr. Tsoflias explained that the DSM-V does not have a specific disorder for nonconsenting sexual interactions, but it has broad criteria and she described why she thought respondent had an attraction to nonconsenting women. She stated, "Because you have to show that the person meets the criteria for a paraphilic disorder. And then as the clinician, you can add what that paraphilia is, which is the nonconsenting persons." She admitted there was nothing in the record indicating that respondent made statements that he is aroused by nonconsenting sexual acts. She explained that it is typically diagnosed this way because most people do not admit to these urges and fantasies.

¶ 39    Dr. Edward Smith testified as an expert in clinical psychology, specifically the evaluation and risk assessment of sex offenders. He is a licensed clinical psychologist and licensed sex offender evaluator in the State of Illinois and was employed as an SVP examiner for DHS.

¶ 40    Dr. Smith was asked to conduct a clinical evaluation of respondent to determine if he met the criteria for commitment under the SVP Act. As part of his evaluation, Dr. Smith reviewed the

available documentation in respondent's file, which included police reports, court records, treatment records, legal documents, and medical records. He also attempted to interview respondent, but respondent declined to participate in an interview. Dr. Smith's evaluation was based on the items contained in respondent's documents.

¶ 41 Dr. Smith submitted his initial report in February 2017, which was updated in June 2017. The update was done because respondent turned 60 years old and updated scoring information was provided. He did not attempt to interview respondent for the update. He also reviewed the reports from other evaluators to ascertain additional background information or statements. Dr. Smith detailed his knowledge of respondent's offenses as well as disciplinary tickets while incarcerated.

¶ 42 In determining a diagnosis, Dr. Smith used the DSM-5. He explained that a paraphilia is "a sexual interest in things that are considered to be outside of what would be considered sort of normal, reciprocal, consensual type of relationships or interactions." He diagnosed respondent with OSPD, "nonconsenting females, nonexclusive type in a controlled environment." He explained that OSPD means "for a period of at least six months, an individual has recurrent and intense sexual arousal to engaging in sexual activities with nonconsenting persons." He further stated, "Nonexclusive type means that the individual is not solely attracted to or aroused by nonconsenting interactions but also has had arousal or interest to individuals who would be considered consenting."

¶ 43 Dr. Smith detailed the facts in respondent's history that fit the criteria for this disorder.

> "Mr. LaRue committing his first sexual offense in 1976, serving time in prison, being then placed on parole, then subsequently while on parole committing the offense in 1979, again at that point being incarcerated for a period of time, again then being released into the community on parole, and then ultimately committing

13

the most recent offense in the community in 1985. So that serves as approximately an eight-year period, seven, eight-year period between 1976 and 1985. So that is beyond that six-month requirement.

In the assaults, Mr. LaRue -- two of the individuals were alone in a residence. Both were reportedly sleeping prior to engaging in those assaults. In each of the instances that I had mentioned earlier, there was force or threat of force that was used in the assaults. As the individuals had either fought against him or resisted or told him no, Mr. LaRue continued to complete these sexual acts despite the individuals resisting against him."

¶ 44 In his opinion, OSPD is a mental disorder under the SVP Act. Dr. Smith opined that respondent continued to suffer from this paraphilic disorder at the time of trial. He explained:

"The conditions tend to be more chronic in nature. He, I believe, committed his first assault at the age of 19 and then his most recent assault at the age of 27 or 28, somewhere in there. The only times that he has been out in the community on supervision after those offenses he has ultimately re-offended, and it does not appear that he has done anything to significantly change or modify that through like the process of treatment."

¶ 45 Dr. Smith also diagnosed respondent with other specified personality disorder with antisocial traits. He detailed that in this case, there was:

"a pattern of an individual in the course of a number of different years who has been willing to violate the rights of others, put himself and others at risk of harm, making continued decisions that are subject to some type of sanction, whether it be legal sanction or in the case of being in the facilities, like disciplinary tickets like

that, so ongoing sort of willingness to break rules."

¶ 46    In his opinion, respondent's other specified personality disorder with antisocial traits is a mental disorder under the SVP Act. The personality disorder interacts with respondent's paraphilic disorder with a "willingness to violate the rights of others."

¶ 47    Dr. Smith also conducted a risk assessment of respondent and used two actuarial instruments, the Static 99-R and the Static 2002-R. On the Static-99R, respondent scored a 4 which placed him in the above average risk category and was 1.94 times more likely to reoffend than the average sex offender. On the Static-2002R, respondent scored a 4 which placed him in the average risk category and made him 1.38 times more likely than a typical sex offender to reoffend.

¶ 48    He further considered potential additional risk factors that potentially increase a person's risk and in respondent's case, the following factors applied: a personality disorder, any deviant sexual interest, a history of substance abuse, a history of being intoxicated during the offense, a history of being noncompliant with supervision, and a history of impulsivity and hostility. Dr. Smith found that age was the only protective factor applicable to respondent because he had turned 60 but opined that it was not enough to reduce his probability of reoffending. In his opinion, respondent was substantially probable to engage in future acts of sexual violence. He further opined that respondent met the criteria to be found a SVP under the SVP Act.

¶ 49    Dr. Romita Sillitti testified on respondent's behalf. She is a licensed clinical psychologist and a licensed sex offender evaluator. She was employed with Cermak Health Services, which is the medical and psychological services of the Cook County Jail. She oversaw the mental health services for the mentally ill detainees and provided individual and group treatment. She also worked part-time in private practice providing sex offender evaluations.

¶ 50    Dr. Sillitti conducted an evaluation of respondent in 2013. She was contacted by

respondent's attorney and appointed as an expert by the court. For her evaluations, she reviewed respondent's records, including police reports, court documents, medical records, his Department of Corrections file, treatment records, and disciplinary history. She interviewed respondent in September 2013 for approximately three and a half hours. She also saw him for an additional half hour on another date. She submitted her report in April 2014 and an updated report was prepared in August 2018.

¶ 51     In her opinion, respondent did not have a mental disorder as defined by the SVP Act. She also opined that respondent "presents with risk factors for sexual and violent recidivism," but it is not due to a mental disorder. To a degree of psychological certainty, she found that respondent did not meet the criteria to be an SVP.

¶ 52     Using the DSM-V, Dr. Sillitti diagnosed respondent with alcohol use disorder due to his reported history of repeated alcohol use and a cannabis use disorder because he had a regular pattern of cannabis use. Neither of these disorders qualifies as a mental disorder under the SVP Act because they are not disorders that affect respondent's emotional or volitional capacity.

¶ 53     She also diagnosed respondent with "mixed personality traits" of antisocial and narcissistic personality based on the interview and the reviewed documents. She did not believe he fully met the criteria for any of the personality disorders. She did not diagnose him with antisocial personality disorder because respondent did not have a juvenile history prior to arrests when he was 17 and she lacked clear evidence of a conduct disorder. Typically with antisocial personality disorder, the traits can decrease with age. She observed that while in the Department of Corrections, respondent received 100 disciplinary tickets, but more recently, he did not have tickets which indicates compliance with social norms.

¶ 54     Dr. Sillitti explained why in her opinion respondent's diagnosis of other specified

personality disorder was not a mental disorder under the SVP Act. She observed that some disorders affect a person's thinking, they do not know reality from fantasy, or their mood regulation can make them unable to control themselves. She explained those problems can affect a person's emotional or volitional capacity. She found personality disorders, by definition, are a way of thinking and a way of interacting with people, but they do not affect a person's ability to make choices.

¶ 55    Dr. Sillitti did not believe that respondent met the criteria for a paraphilic disorder because his sex offenses did not indicate that he was motivated by a special or specific pleasure in the nonconsent. A paraphilic disorder may be diagnosed based on behavior alone, but it is difficult because rape is motivated by many different factors. She did not see any specific statements that respondent was aroused by nonconsenting acts. She found that respondent has a "pattern of wanting what he wants, not really respecting limits." According to her, respondent's sex offenses "seemed opportunistic" and he was high or drunk. She also found the sexually explicit letters to his niece to be opportunistic in his mind that there was an opening to talk about sex and showing "extremely poor boundaries."

¶ 56    Dr. Sillitti also assessed respondent's risk using the Static 99-R and the Static 2002-R actuarial instruments. On the Static-99R, respondent scored a 5 which placed him in the above average risk category and in the 89th percentile of sex offenders and is 2.7 times more likely to reoffend. On the Static-2002R, respondent scored a 5 which placed him in the above average risk category and in the 78th percentile of sex offenders and also made him 1.9 times more likely than a typical sex offender to reoffend.

¶ 57    Dr. Sillitti found additional dynamic risk factors that increased the likelihood of reoffense: general antisocial and criminal lifestyle; the offensive supportive attitudes that "it is okay to rape";

"sexual entitlement issues"; noncooperation with supervision based on his failure to comply while on parole; "anger and hostility"; sexual violence; sexual preoccupation; and poor sexual boundaries. She stated that these factors can change over time and noted respondent's decrease in rule infractions and ability to comply with structure. She did not find these factors were a product of a mental disorder but arose from his personality characteristics and life circumstances.

¶ 58    During the jury instruction conference, respondent requested a nonpattern jury instruction stating:

> "Evidence that the respondent was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the respondent has a mental disorder."

¶ 59    The State objected to the instruction and argued that the instruction was "confusing." After a discussion, the trial court denied the instruction and agreed that it was "a bit confusing."

¶ 60    Following deliberations, the jury found respondent to be an SVP. Respondent filed a motion for a new trial, which the court denied. On June 15, 2020, following a March 2020 dispositional hearing, the trial court committed respondent to the care of DHS in a secure facility.

¶ 61    This appeal followed in compliance with Illinois Supreme Court Rule 303 (eff. Jan. 1, 2015) with a timely notice of appeal filed on June 29, 2020. Accordingly, this court has jurisdiction of this appeal under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 62    The SVP Act allows for the involuntary commitment of "sexually violent persons" by the DHS for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2016). As relevant here, a "sexually violent person" is defined under the SVP Act as "a person who has been convicted of a sexually violent offense, *** and

18

who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." *Id*. § 5(f). A "mental disorder" is a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id*. § 5(b).

¶ 63    On appeal, respondent first argues that the trial court abused its discretion when it denied his request for a nonpattern jury instruction. Specifically, respondent contends that the submitted instruction mirrored the language from section 35(e) of the SVP Act which detailed the State's burden of proof. 725 ILCS 207/35(e) (West 2016).

¶ 64    At the jury instruction conference, respondent requested the following instruction.

> "Evidence that the respondent was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the respondent has a mental disorder."

¶ 65    The State objected and noted that the jurors had previously been questioned on this point. The prosecutor stated that the question was "appropriate having not heard any of the evidence." The prosecutor felt at that time, the instruction was "confusing now that the evidence about these offenses has been submitted to the jury because it almost looks like it can be interpreted to mean that just because he has committed the sexual offenses, the facts of those offenses can't establish he has a mental disorder which is not what is intended by this." The prosecutor agreed that the proposed instruction was an accurate statement of sections 35(e) of the SVP Act (725 ILCS 207/35(e) (West 2016)), but the statute was "essentially saying that just simply providing certified copy of conviction for prior sexual offenses cannot establish the respondent has a mental disorder."

¶ 66    Defense counsel responded that the question was already asked of all the prospective jurors

and is a "specific statement of the law that is included" in the SVP Act. Counsel argued that the instruction was "not confusing and that read in context with the other jury instructions that will be provided is perfectly appropriate for the jurors to receive." The trial court pointed out that it had ask the "specific question to each and every individual juror, and each and every juror indicated to this Court that they understood and accepted this legal principle." The court agreed with the State and found the instruction "may be a bit confusing," and denied respondent's request for the instruction.

¶ 67 "A trial court's choice of jury instruction is reviewed for abuse of discretion." *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 45. "A trial court's ruling will be considered an abuse of discretion only if it is unreasonable, arbitrary, or where no reasonable person would take the same view as the court." *In re Commitment of Anderson*, 2014 IL App (3d) 121049, ¶ 15. " 'Further, a reviewing court will not ordinarily reverse a circuit court, even if the circuit court gave faulty instructions, unless the instructions clearly misled the jury and resulted in prejudice to the defendant.' " *Butler*, 2013 IL App (1st) 113606, ¶ 45 (quoting *People v. Polk,* 407 Ill. App. 3d 80 (2010)).

¶ 68 Respondent's proposed instruction does mirror the language of section 35(e), which states: "Evidence that the person who is the subject of a petition under Section 15 of this Act was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the person has a mental disorder." 725 ILCS 207/35(e) (West 2016). Respondent contends that section 35(e) "dictates what kind of evidence is insufficient to prove beyond a reasonable doubt that a respondent has a mental disorder." According to respondent, section 35(e) acts to prevent the commitment of individuals solely based on the fact they committed sex offenses. Respondent asserts that the

proposed instruction was appropriate because Dr. Tsoflias and Dr. Smith diagnosed respondent with OSPD only because he had committed sexual assaults.

¶ 69    In response, the State argues that respondent is incorrect that section 35(e) limits the type of evidence the State may introduce to prove that respondent has a mental disorder. The State asserts that it is well established that an expert may rely on a respondent's past sexual behavior, including prior convictions, in forming his or her opinion regarding whether the respondent has a mental disorder. The State further contends that Dr. Tsoflias and Dr. Smith both relied on evidence about respondent's history from multiple sources in reaching their respective diagnoses, such as behavioral history, medical history, Department of Corrections records, and police reports.

¶ 70    Both case law and the SVP Act allow the introduction of prior sex offenses to assist the expert in reaching an opinion as to whether a respondent has a mental disorder. "While a prior sexually violent offense is not sufficient to establish that a person has a mental disorder, experts are not prohibited from relying on the underlying behaviors manifested during prior offenses in the diagnosis of a particular mental disorder. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 59 (citing *In re Detention of Hardin,* 238 Ill.2d 33, 51 (2010)). Additionally, section 35(b) of the SVP Act provides: "At the trial on the petition it shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments, if any, were imposed." 725 ILCS 207/35(b) (West 2016).

¶ 71    Contrary to respondent's argument that the State's experts based their diagnoses only on respondent's prior sex offenses, the record before us clearly established that both Dr. Tsoflias and Dr. Smith considered all of respondent's history, not just his prior convictions, in diagnosing him with OSPD. In addition to respondent's records, Dr. Tsoflias relied on her interview with respondent in which he minimized his actions and responsibility and blamed at least one of the

21

victims. Respondent declined to be interviewed by Dr. Smith. Both experts testified that in addition to respondent's prior sex offenses, they considered his medical history, his prior arrests for nonsexual offenses, his failure to complete sex offender treatment, and his approximately 100 disciplinary tickets while incarcerated, some of which included sexual misconduct. Both Dr. Tsoflias and Dr. Smith consulted with DSM-V to support their diagnoses of OSPD, nonconsenting females, in a controlled environment.

¶ 72    While respondent disagreed with opinions of Dr. Tsoflias and Dr. Smith, he presented his theory of defense through Dr. Sillitti. But since the State did not rely solely on respondent's prior sex offenses as evidence to establish that respondent had a mental disorder, the trial court did not abuse its discretion in denying respondent's request. As the trial court observed, the instruction had the potential to confuse the jurors, who had already been questioned on this principle during *voir dire*. The trial court properly instructed the jury on the propositions the State was required to establish beyond a reasonable doubt in order to find respondent an SVP and that the burden to prove each proposition belonged to the State. Accordingly, no abuse of discretion occurred in the denial of this instruction.

¶ 73    Next, respondent asserts that the trial court abused its discretion in limiting his cross-examination of Dr. Tsoflias and Dr. Smith. Specifically, he contends that he was precluded from asking questions about the basis of their opinions or exploring facts that discredited their opinions.

¶ 74    "A trial court is charged with the responsibility of determining whether evidence is relevant and admissible." *People v. Williams*, 2015 IL App (1st) 131103, ¶ 58. "The scope of cross-examination lies within the sound discretion of the trial court, and the court's ruling will not be overturned [absent] a clear abuse of that discretion." *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 605 (2007). "The decision to exclude expert testimony is within the sound discretion of

the trial court and will not be disturbed on review absent an abuse of discretion." *Anderson*, 2014 IL App (3d) 121049, ¶ 15. "A trial court's ruling will be considered an abuse of discretion only if it is unreasonable, arbitrary, or where no reasonable person would take the same view as the court." *Id.*

¶ 75    Here, respondent raises multiple challenges to the testimony of both Dr. Tsoflias and Dr. Smith. However, respondent failed to raise all but one of these claims in his motion for a new trial. "To preserve a claim for appeal, a litigant must raise it both in a timely objection and in a written posttrial motion." *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 31. "Otherwise, the litigant forfeits the claim." *Id.* Therefore, respondent has forfeited the unpreserved claims on appeal and we will only consider the claim properly preserved for appeal. *In re Detention of Hayes*, 2014 IL App (1st) 120364, ¶ 41; *In re Detention of Melcher,* 2013 IL App (1st) 123085, ¶ 65 (holding issues not raised in posttrial motion forfeited on appeal).

¶ 76    Respondent argues that the trial court erred by barring defense counsel from questioning Dr. Tsoflias and Dr. Smith about the relative risk ratios used to compare respondent to other sex offenders. Respondent contends that counsel sought to elicit testimony regarding how likely the average sex offender is to reoffend. During his cross-examination of Dr. Smith, respondent made an offer of proof after the State objected to this testimony. Defense counsel stated:

> "The question that I had asked of Dr. Smith was related to his testimony regarding the percentile rank and the relative risk ratio. He specifically had told us that based on his score of 4, Mr. LaRue is 1.94 times more likely to re-offend than the typical sex offender, and the typical sex offender has a score of 2 on the Static-99R.
>
> My position is that the score of 2 really tells us nothing and that we need additional information about the absolute risk numbers in order to understand how

likely the average sex offender is to re-offend. I would note that Dr. Smith has included in his reports the absolute risk numbers. They are relevant to his testimony. They give some context for how likely an

average sex offender is to re-offend.

*** 

I would like to make an offer of proof as to what he would testify to if he were permitted to testify about the absolute risk for a score of 4 on the Static-99R. Specifically, he would testify -- and this is from his report -- that for a score of 4, the absolute risk for the routine corrections group is 11 percent in five years. And for the high risk, high needs group, it is 17.3 percent in five years and 27.3 percent in ten years. He does include in his report both of those calculations."

¶ 77     The State responded that the court had granted its motion *in limine* to bar testimony that defined substantially probable as a percentage. Defense counsel stated that she did not ask what percentage is associated with substantially probable. The trial court sustained the objection and noted that case law is clear regarding the percentages.

¶ 78     The State contends that this argument fails as Illinois has already rejected the request to explain the "substantially probable" phrase in the definition of an SVP in percentages. In its reply brief, respondent maintains that he did not seek to introduce a specific percentage that he is likely to reoffend. Rather, he sought to question Dr. Tsoflias and Dr. Smith about "absolute recidivism statistics" and "what statistics the evaluators used to form their opinions."

¶ 79     In *In re Detention of Hayes*, 321 Ill. App. 3d 178, 186 (2001), the respondent asserted the SVP Act's definition of "sexually violent person" violated his substantive due process rights because the use of the phrase "substantially probable" in the definition created a lower standard

than the "likely" standard approved by the United States Supreme Court in *Kansas v. Hendricks*, 521 U.S. 346 (1997). The *Hayes* court found the "substantially probable" language did not violate due process and was constitutional. *Id.* at 189. In its ruling, the court rejected the respondent's argument the *Hendricks* decision required a probability of reoffense greater than 50%. The *Hayes* court observed that, "[t]he question of substantial probability under the Act cannot be reduced to mere percentages." *Id.* at 187. The court explained that, instead of a mathematical standard, "the combination of a 'likely' standard with evidence of mental illness complied with due process because the statutory requirements served to 'limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.' " *Id*. at 187-88 (quoting *Hendricks*, 521 U.S. at 358).

¶ 80 Moreover, the *Hayes* court reasoned that even if they assumed the *Hendricks* decision established a minimum threshold of danger to justify commitment, the SVP Act's definition of sexually violent person met or exceeded the requirement. *Id.* at 188. The reviewing court concluded that the phrase "substantially probable" in the SVP Act meant "much more likely than not." *Id.* The court emphasized that "this definition cannot be reduced to a mere mathematical formula or statistical analysis." *Id*. According to the court, "the jury must consider all factors that either increase or decrease the risk of reoffending and make a commonsense judgment as to whether a respondent falls within the class of individuals who present a danger to society sufficient to outweigh their interest in individual freedom." *Id*.

¶ 81 In his evaluation, Dr. Smith specifically cautioned about the difference between whether an individual is dangerous if it is substantially probable that he or she will reoffend and the statistics from the actuarial instruments measuring the likelihood a sex offender will reoffend, charged, and convicted.

"It is important to understand the difference between the statutory threshold for dangerousness and estimates of recidivism provided by actuarial instruments. By Illinois Statute, an individual is dangerous if it is 'substantially probable that the person will engage in acts of sexual violence' in (§725 ILCS 207/5(f)). The actuarial assessment instruments utilized in this evaluation provide estimates of the likelihood that a confined sex offender, at some defined interval after release, engaged in an act of sexual violence and was charged or convicted (Static-99R, Static-2002R) for that act of sexual violence. The answer to the statutory question regarding engaging in acts of sexual violence becomes confounded, in any risk assessment, with measures of how well the criminal justice system detects sexual violence and brings formal charges and/or prosecutes offenders. There are multiple reasons to believe that the criminal justice system neither detects nor prosecutes all acts of sexual violence (Doren, 1998; Hanson & Bussiere, 1998; Wood, Grossman, & Fichtner, 2000; Hanson & Morton-Bourgon, 2004). Furthermore, the statutory threshold for dangerousness is not time limited, whereas the actuarial instruments predict re-arrest or re-conviction of a sexual crime within a defined time period. Therefore, although actuarial predictions of risk are more accurate than other risk assessment methods (e.g., unguided clinical judgment), they are conservative predictions that underestimate actual risk."

¶ 82    Thus, by Dr. Smith's own warning, the statistics do not accurately reflect whether respondent was substantially probable to reoffend, which was the question before the jury. Given the holding under *Hayes* that bars the use of percentages to assess the risk of reoffending and leaves the determination to the jury's common sense, no abuse of discretion occurred here. We

disagree with respondent's argument that the statistics for the risk values for individuals with same scores on the actuarial instruments does not correlate with assigning percentages to the question of whether respondent was substantially probable to reoffend. Both statistics relate to recidivism as it relates to the jury's determination as to whether respondent was an SVP. The trial court's decision to sustain the State's objection to this testimony from both Dr. Tsoflias and Dr. Smith was not an abuse of discretion.

¶ 83    Respondent finally contends that the State failed to prove beyond a reasonable doubt that he is an SVP. Specifically, respondent asserts that the testimony of Dr. Tsoflias and Dr. Smith failed to provide explanations for their opinions that respondent has a current mental disorder under the SVP Act and he is dangerous because a mental disorder makes him substantially probable to reoffend. The State responds that the expert testimony sufficiently established that respondent suffered paraphilia NOS, sexually attracted to nonconsenting females, in a controlled environment, which predisposed him to engage in acts of sexual violence against women.

¶ 84    "When reviewing claims challenging the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. A reviewing court will not reverse a jury's SVP determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56. It is not the role of the reviewing court to substitute its judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence. *Id.*

¶ 85    "To establish that respondent was an SVP, the State had to prove beyond a reasonable doubt that (1) respondent was convicted of a sexually violent offense; (2) he has a mental disorder;

and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence." *Fields*, 2014 IL 115542, ¶ 20 (citing 725 ILCS 207/5(f), 35(d) (West 2012)).

¶ 86    Respondent does not challenge the first requirement, but argues that the expert testimony failed to establish that he had a current mental disorder, and thus, the State did not establish the second and third requirements. "Mental disorder" is defined under the SVP Act as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016). "While our supreme court 'has not given us guidance as to what sort of factual predicate suffices to establish the presence of a mental disorder,' in determining whether the State has met its burden, our appellate courts have routinely relied on expert testimony, and deferred to the factfinder's determinations regarding an expert's credibility." *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 48 (quoting *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36); see also *Fields*, 2014 IL 115542, ¶ 27; *White*, 2016 IL App (1st) 151187, ¶¶ 58-62.

¶ 87    Respondent contends that the experts' opinions were not sufficient to prove beyond a reasonable doubt that he suffers from a current mental disorder. In support, respondent relies on the supreme court's decision in *People v. Murray*, 2019 IL 123289. However, we find respondent's reliance to be misplaced.

¶ 88    In that case, the defendant argued before the supreme court that the State had failed to prove him guilty of unlawful possession of a firearm by a gang member because the State failed to prove the Latin Kings were a street gang. *Id*. ¶¶ 1, 17. In order to prove the defendant guilty of unlawful possession of a firearm by a street gang member, the State was required to present proof that the Latin Kings are a "streetgang" as defined in the Illinois Streetgang Terrorism Omnibus Prevention Act (Act) (740 ILCS 147/10 (West 2012)). *Id*. ¶ 22. During the trial, the trial court had

allowed a police detective to testify as an expert on street gangs. In his testimony, the detective stated that he was familiar with the Latin Kings and concluded that the Latin Kings were a street gang, but did not disclose any specific crime evidence. *Id.* ¶¶ 26-27.

¶ 89 The supreme court observed that the detective "generally described in broad terms the types of information and facts on which his opinion was based, but he never explained his reasons as to why that information supported his opinion." *Id.* ¶ 31. The court further reasoned that the detective "described the nature of his experience and familiarity with the [relevant law enforcement] databases, but he never explained the reasons or information and facts that supported his opinion, and he never connected his reasons or the information and facts to defendant to satisfy the statutory definition of 'street gang.' " *Id.* ¶ 34. The *Murray* court found that "the State presented no evidence of the Latin Kings' involvement in specific crimes as required by the Act. See 740 ILCS 147/10 (West 2012)." *Id.* ¶ 36. Further, the detective "did not identify the Latin Kings' commission of particular offenses on certain dates," nor did the State present any other witnesses who testified to this required evidence to satisfy the statutory definition of "street gang" under the Act. *Id.*

¶ 90 Recently, the Second Division of this Court considered *Murray* and rejected its application to expert testimony provided in SVP cases. *Moody*, 2020 IL App (1st) 190565. In *Moody*, the respondent made a similar challenge that the State failed to prove beyond a reasonable doubt that he has a mental disorder as defined under the SVP Act. *Id.* ¶ 47. In support of his argument, the respondent relied on *Murray*, but the reviewing court found the case to be "inapposite." *Id.* ¶ 53.

> "Contrary to *Murray*, which involved an expert who testified as to the types of information underlying his opinion without testifying as to the connection between that information and his summary opinion, both [of the experts] extensively testified that the pattern of respondent's behavior documented in the

records they reviewed led directly to their diagnoses. The two experts did not render summary opinions on a requisite element based merely on unexplained personal familiarity." *Id.*

¶ 91    The *Moody* court reviewed the testimony from the expert witnesses in which the respondent had been diagnosed with "OSPD, nonconsent, antisocial personality disorder, and voyeuristic disorder." *Id.* ¶ 49. The experts explained the medical definitions of the conditions and detailed why they diagnosed the respondent with these disorders and that their "conclusions were based upon the respondent's records and his admissions while in treatment and outlined how the facts of the respondent's life and the circumstances of his repeated sexual offenses supported their diagnoses." *Id.* The court, after viewing the record in the light most favorable to the State, found that a rational trier of fact could have found beyond a reasonable doubt that the respondent had a mental disorder as defined under the SVP Act. *Id.*

¶ 92    Respondent in this case argues that *Moody* is "not dispositive because it incorrectly conflated diagnosis with whether the respondent has a mental disorder under the SVP Act." Respondent contends that the SVP Act does not require a diagnosis under the DSM-V, but requires proof of a mental disorder as defined the SVP Act. Respondent's argument is misplaced and we find *Moody* to be on point and analogous to the present case.

¶ 93    We also find *Murray* distinguishable from the instant case. In that case, the detective expert failed to satisfy the statutory requirements to establish that the Latin Kings were a street gang under the Act. Here, both Dr. Tsoflias and Dr. Smith provided sufficient relevant testimony that respondent has a mental disorder under the SVP Act. As previously discussed, "mental disorder" under the SVP Act is defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS

270/5(b) (West 2016).

¶ 94   The State presented the expert opinions of Dr. Tsoflias and Dr. Smith. Both experts diagnosed respondent with OSPD, nonconsenting females, in a controlled environment and the disorder is chronic in nature. The experts also diagnosed respondent with a personality disorder with antisocial and narcissistic traits. Both experts provided clinical definitions of these three mental disorders and explained why they diagnosed respondent with these disorders. Further, the experts explained that they based their respective conclusions on respondent's records and outlined how the facts of the respondent's history and the circumstances of his repeated sexual offenses supported their diagnoses. Both Dr. Tsoflias and Dr. Smith discussed that OSPD is a congenital or acquired disorder and addressed how respondent's disorder affected his emotional and volitional capacity. Additionally, both experts detailed respondent's likelihood to reoffend under two actuarial instruments as well as respondent's dynamic factors that impacted his mental disorder, including his sexual violence, impulsivity, minimization of his acts and offense and his responsibility, and noncompliance with rules.

¶ 95   Dr. Tsoflias opined that the aspects of respondent's personality disorder make it more likely that he will act on the paraphilic disorder because respondent is impulsive and lacks empathy for his victims. She further observed that respondent was not currently seeking treatment, nor had he ever completed a treatment program for his sex offenses. Similarly, Dr. Smith stated that in his opinion, respondent continued to suffer from a paraphilic disorder and explained that when respondent was in the community on parole, he reoffended and he has not sought treatment to change or modify that behavior. Dr. Smith further opined that respondent's history displayed a willingness to violate the rights of others through his crimes as well as violate rules, as shown in his 100 disciplinary tickets while incarcerated. Thus, viewing the evidence in the light most

favorable to the State, the jury could have found the State proved beyond a reasonable doubt that respondent had a mental disorder as defined under the SVP Act.

¶ 96    Respondent also argues that even the State proved beyond a reasonable doubt that he has a mental disorder under the SVP Act, it failed to prove the third requirement: respondent is dangerous because a mental disorder makes him substantially probable to reoffend. While respondent concedes that Dr. Tsoflias and Dr. Smith testified about the information they considered in assessing whether he was substantially probable to reoffend, such as, his three convictions for sexual violence, his multiple disciplinary tickets while incarcerated, and his arrests for other offenses. He also admits that the experts assessed his "risk to reoffend using actuarial instruments that measure static, historical factors and by identifying dynamic risk factors." However, he contends this testimony was not sufficient, "a person can be impulsive, hostile, or have difficulty with supervision without having a mental disorder under the SVP Act." According to respondent, the experts did not explain how respondent's risk factors were a product of his mental disorder.

¶ 97    Respondent's argument is not well taken and his continued reliance on *Murray* lacks merit as previously discussed. Although respondent concedes the State's experts did present evidence explaining his mental disorder and the factors that make it substantially probable that he would reoffend, he rejects this evidence as insufficient. However, by his admission, he acknowledged that the State has presented evidence on the third requirement to find him an SVP and his claim is, in essence, attacking the weight of the evidence. It is not our function to retry respondent, and the question of whether the weight of the evidence and the credibility of the witnesses proved that he was an SVP was ultimately the responsibility of the jury. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 62. "We do not require any specific, precise, or exact testimony to find that an

expert sufficiently made the connection between respondent's mental condition and risk of reoffense." *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 76. Based on the record before us, viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could find beyond a reasonable doubt that the State proved that respondent was an SVP under the SVP Act. See 725 ILCS 207/5(b) (West 2016).

¶ 98    Since we have already concluded that the State presented sufficient evidence for the jury to find a mental disorder based on his OSPD diagnosis, we need not reach respondent's contention that the State's experts failed to explain their opinion that his other specified personality disorder was a mental disorder under the SVP Act. Respondent has not cited any authority that the State was required to prove that both his OSPD and other specified personality disorder each qualified as a mental disorder under the SVP Act. Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). It is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990). Arguments unsupported by citation to legal authority are considered forfeited on appeal. *Id.*

¶ 99    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 100   Affirmed.