2025 IL App (1st) 230821-U

No. 1-23-0821

First Division
March 17, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| *In re* COMMITMENT OF JOECEPHUS MITTS | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, Petitioner-Appellee, | ) ) | No. 19 CR 8000301 |
| v. | ) | Honorable |
| Joecephus Mitts, Respondent-Appellant.) | ) ) | Arthur Wesley Willis, Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the civil commitment of respondent where (1) sufficient evidence supported the jury's finding that he is a sexually violent person; (2) the court properly permitted testimony of respondent's two vacated convictions, (3) the court properly ruled on the scope of closing arguments; (4) the court properly exercised its discretion regarding the jury instructions, and (5) there was no cumulative error.

¶ 2     Following a jury trial, respondent-appellant Joecephus Mitts was adjudicated a sexually violent person (SVP), and the trial court committed him to the secure care of the Department of Human Services' (DHS) Treatment and Detention Facility (TDF). Respondent appeals from the

trial court's judgment, arguing that: (1) the State failed to prove beyond a reasonable doubt that he was an SVP; (2) the State improperly elicited testimony from an expert regarding respondent's vacated convictions; (3) the trial court made several improper rulings during closing arguments; (4) the trial court erred by refusing to instruct the jury with two of respondent's proposed instructions; and (5) the trial court's improper rulings resulted in cumulative error. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       In 1994, respondent was convicted of sexually assaulting two women in two separate incidents in December 1993. On April 11, 2019, just prior to his anticipated release from prison, the State filed a petition under the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1, *et seq.* (West 2018)) to commit respondent to the TDF. At the time the petition was filed, respondent was 48 years old.

¶ 5       The case proceeded to a jury trial on September 27, 2022. At the trial, the State presented Dr. Richard Travis and Dr. Elaine Bochenek and respondent presented Dr. Brian Abbott, as expert witnesses.

¶ 6       Prior to trial, respondent filed a motion *in limine*, requesting a limiting instruction for basis of opinion testimony, in lieu of Illinois Pattern Jury Instruction Civil (IPI) 2.04, that mirrored a pattern instruction from Washington, *i.e.* WPI 365.03. The Washington instruction provided as follows:

> "Generally, witnesses testify only to things they observe. However, some witnesses
> are permitted to give their opinions in addition to their observations. In order to assist you
> in evaluating an opinion, a witness may be allowed to give the basis for the opinion. In
> some circumstances, testimony about the basis for an opinion is not appropriate for you to

consider for other purposes. In that instance, I will call to your attention the limited purpose for which the evidence may be properly considered.

(Name of witness) [is about to testify] [has testified] regarding (identify nature of testimony), which is part of the basis for [his] [her] opinion. You may consider this testimony only in deciding what credibility and weight should be given to the opinions of (name of witness). You may not consider it as evidence that the information relied upon by the witness is true or that the events described actually occurred."

Respondent asserted that IPI 2.04, set forth below, did not accurately state the law because it did not instruct the jury that basis of opinion testimony cannot be considered for its truth and does not prove the events described actually occurred. In contrast, according to respondent, WPI 365.03 "does a much better job of instructing the jury as to the limited nature of the testimony *** because it clearly advises the jury what it means to not consider something as evidence[.]" The trial court denied respondent's request.

¶ 7    Before each expert testified, the trial court instructed the jury under IPI 2.04:

"The testimony is limited—is allowed for a limited purpose. It is allowed for the witness may tell you what he relied on in forming his opinion. The material being referred to is not evidence in this case. It may not be considered by you as evidence. You may consider the material for purpose of deciding what [weight], if any[,] [y]ou will give opinions testified by this witness. You may hear that again during the course of his testimony."

¶ 8    Each of the State's experts consulted police reports, court records, respondent's behavioral history in the Illinois Department of Corrections (IDOC) and in the TDF, psychological evaluations, and medical records. In reaching their opinions as to mental disorders, the experts

consulted the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition and its Text Revision (collectively, the DSM-V). Respondent agreed to an interview with Dr. Abbott but refused to meet with either of the State's experts.

¶ 9    Both of the State's experts ultimately opined that respondent is an SVP.

¶ 10   Dr. Travis, a licensed clinical psychologist, sex offender evaluator, and sex offender treatment provider, was assigned by the DHS to complete a sexually violent persons evaluation for respondent in 2019, which he updated just prior to trial. From his initial evaluation, Dr. Travis opined that respondent met the criteria to be found an SVP. For his updated evaluation, Dr. Travis reviewed new records from the TDF, Dr. Abbott's 2020 evaluation, and some court documents that were not previously available. He testified that his opinion remained the same in his updated evaluation.

¶ 11   Regarding mental disorders, Dr. Travis diagnosed respondent with other specified paraphilic disorder, sexual coercion of nonconsenting females (OSPD Non-Consent), antisocial personality disorder (ASPD), and alcohol and substance abuse disorder (specifically cannabis). Dr. Travis explained that an OSPD Non-Consent diagnosis requires that, for more than six months, the individual has acted upon "intense, recurring urges or arousal" associated with nonconsensual sex, and an ASPD diagnosis requires evidence of "conduct disorder," meaning antisocial conduct prior to age 15, and other additional criteria such as disregard of the rights of others, deceitfulness, impulsivity, and lack of remorse. He also described ASPD as a "pattern of just taking from other people" with "no concern of their boundaries." In reaching these diagnoses, Dr. Travis considered respondent's "offensive history" as well as "nonsexual thinking patterns, nonsexual violence, how frequently he commits this offense, where those offenses are committed," and "patterns of behavior that are enduring, that are repetitive." This also included criminal behavior for which

respondent was charged but not found guilty. The following is a summary of the incidents as related by Dr. Travis.

¶ 12    In 1989, while he was serving a prison sentence, respondent, wearing a mask, hid in a closet in the medical department. Once everyone left except one woman, respondent turned off all the lights and grabbed the woman. Respondent kissed and choked her. The woman managed to escape eventually. Dr. Travis opined that it was "a sexually motivated offense." Respondent was charged with aggravated battery, unlawful restraint, and criminal sexual assault but pled guilty to aggravated battery and unlawful restraint and received a nine-year sentence. Dr. Travis testified that he read in Dr. Abbott's evaluation that, when respondent was asked about this incident, he stated that he was hiding to steal some medical testing materials and when he came out, the woman grabbed him and he escaped from her. According to Dr. Travis, the records showed that the woman had bruising and scratching on her neck and thus respondent's "statements to Dr. Abbott didn't seem to fit with what was in the record."

¶ 13    Dr. Travis also considered a "cluster" of sexually violent offenses in 1993. According to Dr. Travis, a "cluster of offenses" means that they happen "within a few days of each other and it speaks to a person's impulsivity and a lack of ability to control their behavior." He stated that these offenses took place within two months of respondent being released on parole, but specifically, he was charged with a drug offense and three sexual offenses in a period of eight days.

¶ 14    The first offense occurred on December 14, 1993, when an 18-year-old woman was walking to the bus stop and respondent approached her, announced it was a "stick-up," and pointed a gun at her head. Respondent walked her to an alley and dragged her into a garage, where he vaginally raped her. During the rape, he threatened to kill her and punched her in the face because she was "crying too much." Dr. Travis noted that, in Dr. Abbott's evaluation, respondent reported

that he found the victim "cute" but she had rebuffed him and the robbery was intended to teach her a lesson. Respondent also related to Dr. Abbott that the woman was cooperative and he denied punching her but the report from the incident stated that the woman had bruising on her face. For that offense, a jury found respondent guilty of aggravated criminal sexual assault and attempted robbery. Dr. Travis testified, over respondent's objection, that, on direct appeal, the appellate court vacated the convictions and remanded for a new trial. During a hearing upon remand, respondent moved towards a female district attorney and a deputy intervened. Respondent repeatedly punched the deputy in the face. Respondent was ultimately found guilty by a jury again of both aggravated criminal sexual assault and attempted robbery and he was sentenced to an aggregate 60 years in prison.

¶ 15    The next in the cluster of offenses occurred two days later, on December 16, 1993. On that date, respondent approached another 18-year-old woman, placed a gun to her back, announced it was a "stick-up," and threatened to kill her. He took her into a garage in an alley and forced her to perform oral sex on him and then he vaginally raped her. He also stole the woman's necklace. Similar to the previous case, respondent was convicted of aggravated criminal sexual assault, but the conviction was vacated on appeal, and upon remand, respondent pled guilty to aggravated criminal sexual assault and was sentenced to six years in prison.

¶ 16    The final incident in the cluster occurred about six days after the second assault. Again, respondent approached a woman, announced a "stick-up," threatened to shoot her, and then took her to a garage where he forced her to perform oral sex on him and attempted to anally rape her before vaginally raping her. Although respondent was acquitted of that offense, Dr. Travis considered the incident in arriving at his diagnoses given its similarity to the other two offenses, specifically the words used and the escalation of the offenses.

¶ 17    Dr. Travis considered other crimes in his evaluation of respondent. When respondent was 17 years old, he entered a car when an elderly woman offered him a ride. Respondent pushed the woman out of the car and tried to drive away as the woman was briefly dragged down the street. A high-speed chase with law enforcement ensued and ended when he backed into a police vehicle. Respondent was convicted of robbery and aggravated battery, and he was sentenced to five years in prison, during which the 1989 assault in the medical department occurred. Dr. Travis noted that, although the auto theft was a nonsexual offense, it increased respondent's risk as part of the risk assessment. Dr. Travis also considered respondent's battery of the deputy in the courtroom for which he was found guilty,  and another incident where he was waiting for correctional officers to escort him to court and he attacked them while wearing goggles.

¶ 18    Dr. Travis next reviewed respondent's behavior while in prison and in the TDF for the "cluster offenses." According to Dr. Travis, there was a sexual misconduct incident in 2014, where respondent was receiving phototherapy treatment for a skin condition and respondent "fondle[d]" a nurse's buttocks. Respondent also committed a "minor violation" in November 2021 for possessing contraband. Dr. Travis also noted that a week before the trial respondent was in the gym where other people and a "rec therapist" were present and he "strip[ped] down to his boxers and T-shirt" and changed into different clothes. Dr. Travis stated that this showed respondent's poor judgment and impulsivity, although respondent did not receive a disciplinary violation for the incident.

¶ 19    Dr. Travis testified that respondent met the DSM-V criteria for OSPD Non-Consent because, over a period greater than six months, he engaged in behavior where he sexually assaulted females or attempted to sexually assault females, including threatening to kill them, hitting them, and choking them. Dr. Travis stated that nothing in the records indicated that respondent expressed

any remorse for the sexual offenses. He also stated that respondent's violations and misconduct have decreased during his incarceration, and, therefore, his disorder was remitting but was not in remission or remitted. He explained that, because respondent has been in a controlled environment, *i.e.* prison and TDF, he cannot be considered to be in remission. Respondent would be considered in remission after he has been in the community where he would have access to women and does not act on his urges to sexually harm others for five years.

¶ 20    As to ASPD, Dr. Travis opined that respondent satisfied the requirement for a "conduct disorder" given his history of nonsexual offenses before the age of 15, along with respondent's deceitfulness, impulsivity, "hostility or irritability," and "lack of remorse." Dr. Travis based respondent's deceitfulness on respondent's incredible explanations for the assaults as compared to the records documenting them. Dr. Travis agreed that ASPD tends to become less evident as people age, and, for respondent, the disorder is "probably less intense of what it used to be just based mainly on his rule-following" but it was not "completely remitted" because respondent's failure to follow rules was not a "significant factor" for his ASPD diagnosis.

¶ 21    Dr. Travis's diagnosis of alcohol and cannabis use disorder was based on a drug and alcohol screening that occurred while respondent was in prison where he stated that "he sought alcohol and drugs and used them more than he intended to" and "experienced increased tolerance to those substances." Dr. Travis stated that this disorder was in remission because "he has no documentation that he is still experiencing anything more than maybe just a craving" but he is still in a controlled environment where he has no access to substances. According to Dr. Travis, "we don't know what it's going to be when he gets back out in the community when he's exposed to alcohol and marijuana again."

¶ 22    Dr. Travis testified that ASPD and OSPD Non-Consent were "intertwined" as qualifying mental disorders under the SVP Act and the alcohol and substance use disorder "disinhibited behavior even further" and also qualified under the SVP Act "when combined" with the other two disorders. Dr. Travis further explained that ASPD and OSPD Non-Consent are both "congenital" and "acquired" disorders in that respondent was born with the disorders and the disorders are also enhanced by his "environment." According to Dr. Travis, these disorders affect his "emotional or volitional capacity," as he has "tunnel vision" to satisfy those urges, without considering "long-term consequences or impact to other people." Dr. Travis continued, stating that respondent's mental disorders "predispose him to engage and continue acts of sexual violence."

¶ 23    Next, Dr. Bochenek, a licensed clinical psychologist, sex offender treatment provider, and sex offender evaluator, testified that, in early 2019, she was assigned to evaluate respondent. Her initial opinion was that respondent met the criteria for an SVP. Since writing her report, she received additional records from the TDF and she reviewed the other experts' reports. However, none of that altered her opinion that respondent qualifies as an SVP.

¶ 24    Using the DSM-V, Dr. Bochenek diagnosed respondent with OSPD Non-Consent and Other Specified Personality Disorder Antisocial Features (OSPD Antisocial Features), and she testified that, taken together, these satisfied the SVP Act. According to Dr. Bochenek, respondent's OSPD Non-Consent drove his behavior but was enhanced by his "disregard for other human beings" from his OSPD Antisocial Features. On cross-examination, Dr. Bochenek agreed that the DSM-V states that when used in a forensic setting there is a risk that diagnostic information will be misused or misunderstood and these dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis.

¶ 25   Dr. Bochenek based her diagnosis of OSPD Non-Consent on respondent's "pattern of behavior occurring over many years," specifically the 1989 assault of a nurse in prison and the three sexual offenses in 1993 while he was out of prison on parole. Dr. Bochenek considered the 1989 assault "sexually motivated" despite respondent not being convicted of a sexual offense. Although respondent was found not guilty of the third sexual offense following a jury trial, Dr. Bochenek still considered this offense because it was part of a pattern of behavior and showed that respondent's "urges were out of control." She stated that, if it had been the only incident, she likely would have disregarded it. But she also acknowledged that she did not know whether the allegations that were lodged against him in that case were true, and she confirmed that respondent had completed his sentences for the 1993 sexual offenses.

¶ 26   She also considered respondent's behavioral history while he was incarcerated. This included a 2006 incident where respondent was discovered by correctional staff while engaging in sexual behavior with another inmate and received a ticket for "sexual misconduct." On cross-examination, Dr. Bochenek disagreed with counsel's characterization of this incident as "consensual sexual activity" because the Illinois Department of Corrections (IDOC) does not "consider that there is a thing as consensual sex" but she agreed that there was nothing in the record that said the other inmate was "being forced against his will[.]" Dr. Bochenek also considered a 2010 incident where respondent received a "disciplinary sanction" for "writing letters of a very personal nature" using "overly familiar language" to a female nurse. Finally, she also considered the 2014 incident where he placed his hand on a female nurse's buttocks during his skin condition therapy. Dr. Bochenek testified that these incidents showed that even in a "very confined environment," respondent was unable to control his sexual urges, but she also acknowledged that respondent had not received any "tickets" for sexual misconduct while in the TDF. She opined that

OSPD Non-Consent is a "lifelong condition" that can be "managed" or "controlled" but respondent had made no attempt to do so. Finally, she acknowledged that respondent did not satisfy any of the eight paraphilic disorders explicitly listed in the DMS-V, that OSPD is sometimes used as a "catchall category," and that there have been failed attempts to make "sexual arousal to nonconsenting partners a standalone diagnosis."

¶ 27    Dr. Bochenek based her diagnosis of OSPD Antisocial on the following. She testified that, "[b]eginning at the age of 17[,] [respondent] had violated social norms by committing crimes, being arrested, being sanctioned to prison and yet he continued to perform criminal acts leading to further incarcerations." Respondent "violat[ed] the rights of others" and exhibited "[d]isregard for the safety of other people" when he pushed an elderly woman out of her car and stole it after she offered him a ride and the woman was injured as a result of his actions. On cross-examination, Dr Bochenek agreed that this offense, however, was not of a sexual nature. Dr. Bochenek also testified that she did not diagnose respondent with ASPD because one of the criteria requires signs of the disorder prior to the age of 15 years old and she did not have access to his juvenile records, although she read in another expert's report that respondent's juvenile history included "[b]reaking into railroad cars and stealing the merchandise, breaking windows out of a building, running away from home." She opined that respondent's OSPD Antisocial Features had not remitted because "personality doesn't change" even if the behavior "tends to reduce somewhat" as people get older. She further testified that respondent exhibits a "pattern of behavior" where he accumulated "a hundred disciplinary sanctions" while incarcerated and he recently "received a ticket[,]" which was only a warning, but it reflected a "resistance to rules and supervision" where "two-thirds of the residents at TDF receive no tickets."

¶ 28    Dr. Bochenek addressed the combined effect of these two disorders, stating that "when you combine someone who doesn't care about the thoughts or harming someone else, is just a disregard for other human beings that would impact the paraphilic disorder because I don't care about this other person." She also stated that the two mental disorders impact respondent's emotional and volitional capacity, they predispose him to engage in sexually violent offenses, and they affect his ability to control his sexually violent behaviors. Dr. Bochenek also, like Dr. Travis, stated that respondent cannot be considered in remission from his disorders because of the controlled environment in which he lives.

¶ 29    Both experts also conducted a risk assessment of respondent, which measures the likelihood that a person will commit another sexual offense, and ultimately concluded that respondent is substantially probable to commit future acts of sexual violence. They both utilized the actuarial instruments of Static-99R and Static-2002R and then looked at respondent's dynamic risk factors and protective factors.

¶ 30    The Static-99R is a research-based "instrument that allows you to assess a person's likelihood of sexually reoffending in the future." On the Static-99R, Dr. Travis scored respondent at a seven out of twelve, which is considered "well-above average risk." The average score on the instrument is two. A score of seven was "associated with re-offending more than five times more often than what was considered to be the typical sex offender" and "[a] score of seven is also higher than 96 percent of all the guys on whom this instrument was normed." Dr. Bochenek, who performed an updated assessment for the Static-99R in September 2022, also scored respondent at a seven. She previously had given respondent a score of six because she did not realize at the time that respondent had not been out in the community long enough to have had an intimate relationship for more than two years, which is one of the factors on that instrument. Regardless,

both scores are in the well-above average risk of sexual reoffending, which is the highest category on that instrument.

¶ 31    Dr. Bochenek stated that the Static-2002R "looks at additional factors such as criminal history over and above what's given in the [Static-99R]." On the Static-2002R, Dr. Travis scored respondent at a six, which is the second highest risk category. At a six, respondent "is about three times more likely to sexually re-offend than a person who's considered to be a typical sex offender scoring a three on this instrument." This score is "higher than 85 percent of the guys on whom the test was norm" and is associated with "being three times more likely to sexually re-offend" than "a typical sex offender scoring a three on this instrument." Dr. Bochenek originally scored respondent at a six but her updated score for respondent was a five, which is in the category of above average risk and the second highest risk category as well. On cross-examination, she stated that she changed her score because she had scored the instrument incorrectly originally.

¶ 32    The Static instruments only look at five- or ten-year predictions, and with respondent's scores, he had a five-year absolute recidivism risk of 24 percent and a ten-year absolute recidivism risk of 33 percent on the Static-99R and "similar numbers" for the Static-2002R. According to Dr. Travis, actuarial instruments underestimate the actual risk that a respondent will actually re-offend because they only consider charged offenses "but we don't know to what degree."

¶ 33    The experts also considered dynamic risk factors. Dr. Travis testified that he considers "how a person is changing their attitudes and whether or not they had any positive influences in their life, whether they're still hostile towards females" but this was difficult for him to determine without an interview. Dr. Travis further testified that none of the factors "raise[d] [respondent's] risk" because he is already in the highest risk category. Dr. Bochenek assigned respondent the factors of deviant sexual interest, lack of intimate relationships with adults, resistance to rules, and

impulsivity and a lack of behavioral control. She further testified that these factors could be considered as part of the assessment even if their collective effect could not be quantified.

¶ 34    As to protective factors, both experts considered the completion of treatment, debilitating medical conditions, and age. However, both experts opined that age is already factored into the actuarial instruments and respondent "still scored in the highest risk categories on the 99R and the second highest category on the 2002R." Both also noted that respondent had not engaged in any sex offender specific treatment and that his skin conditions did not make him less likely to re-offend. Dr. Travis further admitted that lack of treatment "neither adds to [nor] subtracts from risk."

¶ 35    On cross-examination, Dr. Travis explained that "relative risk ratios statistically are a better way of looking at risk with people who are convicted of sexual offenses than looking at absolute risk rates, which are different from sample to sample." He further testified that pure actuarial instruments should not be relied on by themselves "because those actuarial risk assessments don't include all [of] the risk factors" but they do have "the highest predicted accuracy when compared to other methods [in] isolation."

¶ 36    Also on cross-examination, Dr. Bochenek testified that the meta-analyses that identify these dynamic risk factors only study how "a single factor correlate[s] with sexual reoffense," rather than how "a combination of risk factors affects risk." She acknowledged that some of the dynamic risk factors "overlap" with the factors from the Static-99R, although "[t]hey're not measuring the exact same thing." For instance, Dr. Bochenek agreed that the dynamic factor of "deviant sexual interest/sexualized violence" and the Static-99R's consideration of prior offenses were "two sides of the same coin" and that, given respondent's lengthy incarceration, there was overlap, though "not an exact overlap[,]" between the dynamic factor of "lack of emotionally

intimate relationships with adults/never married" and the Static-99R factor of "lived with a lover for at least two years." However, Dr. Bochenek emphasized that the developers of the actuarial instruments "say you should not rely solely on a static score for an evaluation" and recommend considering the dynamic risk factors with protective factors.

¶ 37 After the State concluded their case-in-chief, respondent motioned orally for a directed finding in his favor, which the court denied.

¶ 38 On behalf of respondent, Dr. Abbott, a licensed clinical psychologist (though not in Illinois) and licensed sex offender evaluator, testified that he was contacted to conduct an SVP evaluation of respondent. Dr. Abbott performed a screening of respondent's case and agreed to accept the appointment to complete an evaluation because he "felt there were issues in dispute that raised questions in [his] mind[.]" Dr. Abbott reviewed respondent's file which contained police reports, criminal history records, IDOC records, mental health records, TDF records, and the State's expert's reports. He also conducted a three-hour interview with respondent on October 16, 2020. At the conclusion of his evaluation, Dr. Abbott's opinion was that respondent is not an SVP because he does not suffer from a mental disorder as defined by the SVP Act. In particular, he testified that respondent had once suffered from ASPD but the disorder had fully remitted and therefore he no longer suffered from a qualifying mental disorder. Further, he found that, even if respondent suffered from a qualifying mental disorder, he was not substantially probable to engage in future acts of sexual violence.

¶ 39 As to ASPD, Dr. Abbott testified that respondent's "clinical presentation *** during his younger years was consistent with him suffering from [ASPD,]" but "his condition began to lessen as he got older" and by the time respondent was "roughly 50 years old, in [his] opinion the condition had remitted in that he no longer met the criteria[.]" Dr. Abbott acknowledged that

respondent met the conduct disorder criteria because, prior to age 15, he vandalized property and disobeyed his parents and he once displayed a "pervasive pattern of disregard for the violation of the rights of others." However, Dr. Abbott testified that these symptoms remitted over time. In particular, he noted that irritability and aggressiveness was not exhibited for more than ten years. According to Dr. Abbott, respondent only had one symptom of ASPD at the time he interviewed respondent, which was lack of remorse, and "that alone is not sufficient to make the diagnosis." Dr. Abbott also cited to research showing that most individuals aged 45 to 64 with ASPD went into remission and that there is a "marked decline" in criminal behavior as offenders aged. He did concede, however, that a "small percentage" of individuals have ASPD for life. He concluded that because "there's no condition that could affect his emotional or volitional capacity that predisposes him to engage in acts of sexual violence."

¶ 40    When asked about the warning respondent received for contraband and the incident where respondent changed clothes in the gym, Dr. Abbott answered that an "isolated behavioral problem in itself is insufficient to say someone continues to have [ASPD] because *** what you have to prove is that it's enduring, inflexible and pervasive problem or behavior that's evident in multiple personal and social context ***." Regarding the incident in the gym, he stated that respondent may have been "impulsive" and exercised "poor judgment" but there "was no record" of a violation.

¶ 41    Dr. Abbott also testified that "sex offenders in custody may not be able to engage in the same kind of sexual offending behavior they did in the community" because their behavior is "restricted in a custody setting *** but for those individuals who *** have difficulty controlling their emotions and volition in a way that predisposes them to commit sexually violent acts, they'll find ways to express their sex offending behavior[,]" such as viewing pornography, exposing themselves to staff, writing stories that describe forcible sexual behavior. He continued: "And that

individual repeatedly engages in those behaviors despite the fact that they're repeatedly sanctioned for it by the custody staff. *** [A]nd we see none of that with [respondent]. None whatsoever."

¶ 42     When asked about OSPD Non-Consent, with which the other experts had diagnosed respondent, Dr. Abbott testified that "there's no clearcut criteria" by which to identify OSPD Non-Consent. He then cited research to show that OSPD Non-Consent has poor inter-rater reliability, which measures the extent to which evaluators agree on the diagnosis for the same patient. Dr. Abbott opined that this lack of "inter-rater reliability" is a result of the lack of agreed upon criteria for the diagnosis.

¶ 43     Dr. Abbott declined to diagnose respondent with any substance use disorder where there was "conflicting information in the record" and he maintained that respondent's substance use "did not appear to cause impairment" or that it was "a contributing factor to his sex offending behavior[.]"

¶ 44     Dr. Abbott next opined that, even were respondent to have a qualifying mental disorder, he was not substantially probable to commit additional acts of sexual violence. Like the other experts, Dr. Abbott assigned respondent a score of seven on the Static-99R, meaning that "roughly one out of four individuals with that risk profile end up reoffending or three out of four do not reoffend sexually." He also testified that this score carries a five-year absolute risk of recidivism of 23.7 percent. Citing research, Dr. Abbott stated that "absolute risk estimates provide the most relevant information for a jury to evaluate whether someone meets the legal standard set by SVP laws." He testified that he did not use any relative risk ratios because "there's no general consensus on how to use relative risk ratios in this type of forensic proceeding." According to Dr. Abbott, "the Static-99R tend[s] to overestimate sexual recidivism among sex offenders" in the United States by a factor of 1.73, and accounting for that overestimation, Dr. Abbott maintained that brought

respondent's risk of recidivism to 14 percent. He further testified that he did not use the Static-2002R "[b]ecause it overlaps with the Static-99R by 93 percent so they're virtually the same instrument so in [his] opinion they're redundant with each other."

¶ 45    Dr. Abbott then addressed the approach of considering "external risk factors." To that end, he testified that he did not consider such factors because "[t]here's no way to determine whether the results of the dynamic risk factors that are considered increased the likelihood of risk[.]" He also agreed that the coding rules for the actuarial instruments state that the Static-99R does not address all relevant risk factors and a prudent evaluator would consider external factors such as dynamic or changeable risk factors. Dr. Abbott disagreed with this aspect of the coding rules because "they cite no authorities to backup that statement and *** the current research contradicts that statement in the manual" and "you don't follow coding with --- blindly when the science is against how you're trying to use them."

¶ 46    On cross-examination, Dr. Abbott acknowledged that, during the interview, respondent stated that he remained well-behaved because he wants to get released. Respondent also stated that he had many consensual sexual encounters and, regarding the first offense in 1993, respondent stated the woman who he attempted to rob offered herself up, which he understood as a sexual invitation. Dr. Abbott did not consider respondent's characterization of the offense reliable because it is inconsistent with the victim's account. Respondent denied that the next offense in 1993 occurred. He also stated to Dr. Abbott that he feigned schizophrenic symptoms in prison in hopes of getting transferred to a different facility.

¶ 47    Before and during closing arguments, the court admonished the jury to disregard any statement not supported by the law or not supported by at least a reasonable inference from the

evidence. There were numerous objections made during these arguments that are at issue in this appeal, and thus, we set forth the arguments, where relevant, in detail.

¶ 48     In closing, the State described the contents of records the experts relied upon for the basis of their opinion testimony. Specifically, over several objections from respondent, the State presented the following:

"Doctors Travis and Bochenek explained the process they went through, a thorough records review, which included going over [r]espondent's criminal history, which the [d]octors relied on before, and that helps determine -- you can use that to help determine their credibility in their diagnosis and risk assessment.

They started with this 1989 criminal case where he was in prison for stealing a woman's car and dragging her along as he fled. While in prison, he laid and waited for a female prison staff member to be alone. He wore a garbage bag for a hood[.]

* **

He choked her, dragged her down the hallway to the bathroom, and as he continued to choke her, he decided to kiss her, too. She fought back and was able to escape. Respondent was convicted in that case. The Respondent issued -- demonstrated no remorse there. When he was asked about it by Dr. Abbott, he stated that the employee came upon him and tried to grab him. He doesn't explain how she got the bruising, though. Then the next series of offenses that the doctors considered came in 1993 when the [r]espondent was out for two months. In that case, there is a cluster of offenses all involving the same pattern of behavior. You heard how that demonstrated impulsivity, a lack of control by the respondent.

The first offense took place on December 14th, 1993. There, the victim was taking the early morning bus home, and prior to getting on the bus, the [r]espondent approached her, said it was a stickup, and pointed a pistol at her [head]. He forced her into a garage, threatened to kill her, and vaginally raped her. Furthermore, he decided to punch her in the face because she was crying too much.

\*\*\*

And what did he say about the offense? That he robbed the victim because he was rebuffed, and she told him he could do what he wanted with her because she didn't have money. Then we go on to the December 16th sexual assault that the experts considered. There, the victim was walking alone. The [r]espondent again states that it's a stickup. He points a pistol at her, he threatened to kill her, he forced her into a garage, and forced her to fellate him. Then he ordered her to undress and vaginally raped her.

\*\*\*

In both of those two offenses, the respondent was convicted of aggravated criminal sexual assault. Then there was the December 22nd criminal assault, which the experts considered because the pattern of behavior was the same, and as in the other cases, the victim identified the respondent. There again, there was a statement that it was a stickup, he grabbed her neck, he pointed a gun at her back and pushed her in the garage, forced her to fellate him, and then he attempted to anally rape[ ] her, and then he vaginally raped her. Ultimately, in that case, he was found not guilty."

¶ 49   Respondent objected throughout this recitation, and the trial court overruled each objection.

¶ 50   Turning to respondent's closing argument, the court sustained the State's objections to the following arguments.

¶ 51 Respondent's counsel argued in closing that Dr. Abbott was credible whereas Drs. Travis and Bochenek were not. In particular, respondent addressed two violations upon which Dr. Bochenek relied in forming her opinion. Specifically, regarding the 2006 infraction for having sexual intercourse with another inmate and the 2010 letters to the nurse, respondent claimed that there was no evidence that the former was nonconsensual and that the latter was not evidence of "arousal to sexual activity with nonconsenting partners." Respondent argued that Dr. Bochenek was "making up nonconsensual activity to support her opinion" and her opinion was therefore "not reasonable and you do not have to accept it." The State objected, and the trial court sustained the objection and instructed the jury "to disregard the last portion of that argument."

¶ 52 Respondent also sought to discredit Dr. Travis. Specifically, respondent referenced Dr. Travis's testimony that respondent received a minor violation, but, on cross-examination, Dr. Travis clarified that it was only a warning, and, according to respondent, "this was an embellishment by Dr. Travis." The State objected, and the trial court sustained the objection and instructed the jury to disregard the last comment. Further, referring to Dr. Travis's testimony that respondent behaved improperly when he changed his clothing in the gym though there was no record of a violation, respondent argued: "I think you can believe or understand that if what Mr. Mitts did was wrong, he probably would have received a ticket." The State objected, and the trial court sustained the objection.

¶ 53 Finally, respondent argued that the jury should consider Dr. Bochenek's analogy of the risk factors being "two sides of the same coin" when assessing whether the State had proven that respondent is substantially probable to engage in acts of sexual violence. In particular, counsel argued:

"And [Dr. Bochenek] also admitted that there was research that said that some of these risk factors overlap with risk factors on the actuarial instruments. One of those was never married, which was one of the risk factors that she assigned to him, with having lived with a lover for more than two years, which was a question on the Static-99R. She said, and I quote, these are two sides of the same coin. Another was deviant sexual interest. That was a risk factor she assigned to him, and on the Static-99R, you have a question about prior sex offenses. Again, she said, and I quote, these are two sides of the same coin. So I submit to you that there's no need to be considering both if there's two sides of the same coin. And if we think about that coin for a minute, if you flip a coin, would you say that it's much more likely than not to land on heads versus tails --"

The State objected, and the trial court sustained the objection, stating: "Counsel should refrain from making any personal opinions. The jury should disregard if there is a personal opinion."

¶ 54   As relevant here, the State's rebuttal began as follows:

[PROSECUTOR]: Ladies and gentlemen, [respondent's counsel] spent a long time talking to you about our burden. We are not shirking our burden here. Our burden is beyond a reasonable doubt, and it's as to three elements. I want you to think about this burden like you are a spectator at a racetrack. *** Every time they finish a lap, one, two, three. This case only has three laps. It has three elements. Our job is to prove that our car crossed the finish line on each lap.

[RESPONDENT'S COUNSEL]: Objection, misstates the burden.

THE COURT: Counsel may argue.

[PROSECUTOR]: That it completely finishes the lap, not that it fell short of the finish line. Respondent's attorneys and Dr. Abbott are here to kick up dust to prevent you as the spectator from seeing whether or not our car --

[RESPONDENT'S COUNSEL]: Objection to shifting the burden.

THE COURT: Sustained in that regard. Counsel may argue, but arguments of lawyers are not to be taken as statements of law. Instruction on the law will come from me after the final arguments are completed.

[PROSECUTOR]: While you're watching this race, these are obviously distractions that are occurring. I want you to stay focused --

[RESPONDENT'S COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: -- on the car, our car as it goes around the circle, one, two, three."

¶ 55 After closing arguments, the trial court then proceeded with jury instructions. As relevant here, during the jury instruction conference, the court rejected respondent's Instruction 23, a non-IPI instruction that would have provided as follows: "Evidence that the Respondent was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the person has a mental disorder." According to respondent, this instruction was based on 725 ILCS 207/35(e) (West 2020). During the jury instruction conference, the court stated that the instruction may confuse the jury. In particular, the court stated:

"Your argument is making it seem to the triers of fact that their determination of reasonable doubt stops prior to the acts that he was convicted of *** because it states it's

not sufficient to establish beyond a reasonable doubt that the person has a mental disorder.

*** The doctors have all testified. They have testified that they look at everything."

The jury was then instructed and proceeded to deliberations.

¶ 56    On September 29, 2022, the jury found that respondent was an SVP, and the trial court subsequently committed him to the secure care of the TDF. On October 27, 2022, respondent filed a motion for a new trial, which was later amended on March 1, 2023. The State filed a response, and respondent filed a reply. On April 10, 2023, the trial court denied respondent's amended motion.

¶ 57    This appeal followed.

¶ 58                                                    II. ANALYSIS

¶ 59    On appeal, respondent claims that (1) the State failed to prove that he was an SVP beyond a reasonable doubt; (2) the State improperly elicited testimony from an expert regarding respondent's overturned convictions; (3) the State made improper closing and rebuttal arguments and the trial court erred in sustaining objections during respondent's closing argument; (4) the trial court erred by refusing to instruct the jury with two of respondent's proposed instructions; and (5) the trial court's improper rulings resulted in cumulative error.

¶ 60                                          A. Sufficiency of Evidence

¶ 61    We begin with the issue of the sufficiency of the evidence. Respondent contends that the State failed to prove that he "has a mental disorder as defined by the SVP Act and failed to prove that he is dangerous because a mental disorder makes him substantially probable to engage in acts of sexual violence."

¶ 62    The SVP Act is intended "to keep our communities safe from predatory sex offenders who pose an ongoing threat to our citizens." (Internal quotation marks omitted.) *In re Detention of Powell*, 217 Ill. 2d 123, 138 (2005). It authorizes the involuntary civil commitment of "sexually violent persons" for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2018). The SVP Act provides that the State must meet its burden of proof beyond a reasonable doubt. 725 ILCS 207/35(d)(1)-(2).

¶ 63    When reviewing the sufficiency of the evidence in the context of commitment under the SVP Act, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could find the elements of an SVP under the SVP Act proved beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. Those elements are: (1) the respondent was convicted of a sexually violent offense; (2) the respondent has a qualifying mental disorder; and (3) that mental disorder makes it substantially probable he will engage in acts of sexual violence. 725 ILCS 207/5(f). We will not reweigh the evidence or second-guess the jury's credibility determinations on appeal. *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 65 (citing *Fields*, 2014 IL 115542, ¶ 27).

¶ 64    Respondent does not dispute the first element, conceding that he has a prior conviction for a sexually violent offense. At dispute in this appeal are the second and third elements, *i.e.* whether respondent suffered from a qualifying mental disorder and whether respondent is substantially probable to commit future acts of sexual violence. Following our review of the record, we conclude that the evidence, viewed in the light most favorable to the State, was sufficient to prove beyond a reasonable doubt that respondent satisfied each statutory element for an SVP. We address each disputed element in turn.

¶ 65    As to the mental-disorder element, respondent claims that the State's experts "undermined the bases for their conclusions" by acknowledging that a DSM-V diagnosis does not necessarily qualify as an SVP disorder and they "failed to explain how [respondent's] diagnoses presently influence his emotional or volitional capacity thus predisposing him to commit acts of sexual violence." Respondent also contends that the State failed to prove that substance use disorders are mental disorders under the SVP Act.

¶ 66    The State asserts that its experts sufficiently proved that respondent's DSM-V diagnoses satisfied the requirement. The experts' diagnoses were properly supported by respondent's criminal history and his behavioral history while in custody. The State further contends that respondent's arguments provide no basis for this court to determine that no reasonable factfinder could have found the State's experts credible.

¶ 67    A "mental disorder," as defined by the SVP Act, is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b). Although our supreme court has not provided guidance as to "what sort of factual predicate suffices to establish the presence of a mental disorder" (*In re Commitment of Gavin (Gavin II)*, 2019 IL App (1st) 180881, ¶ 36), when determining whether the State has met its burden of proof, this court routinely relies on expert testimony and defers to the trier of fact's credibility determinations (*In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 41).

¶ 68    Here, both Dr. Travis and Dr. Bochenek assessed respondent pursuant to the DSM-V and opined that respondent had a qualifying mental disorder. Dr. Travis diagnosed respondent with OSPD Non-Consent, ASPD, and alcohol and cannabis use disorder, while Dr. Bochenek diagnosed respondent with OSPD Non-Consent and OSPD Antisocial Features. Both experts testified that their respective diagnosed mental disorders were both acquired and congenital and were

intertwined with each other. Dr. Travis specifically testified that respondent's ASPD fueled his urges to engage in nonconsensual sex, *i.e.* OSPD Non-Consent, and the alcohol and cannabis use disorder further disinhibited his behavior. Dr. Bochenek testified that her opinion was based on the combined effect of OSP Non-Consent and OSPD Antisocial Features, where the OSPD Non-Consent drove respondent's behavior and OSPD Antisocial Features meant that he did not care if he harmed others in the process of satisfying his urges. Significantly, Dr. Bochenek did not diagnose respondent with ASPD as Dr. Travis had because she did not have access to respondent's juvenile records, which would have shown that the conduct disorder's onset was prior to age 15. Notably, both Dr. Travis and Dr. Abbott testified that respondent's juvenile history satisfied the conduct disorder requirement.

¶ 69    Drs. Travis and Bochenek's diagnoses were supported by respondent's pattern of behavior, which was gleaned from respondent's criminal history and behavioral history. In particular, and contrary to respondent's assertion on appeal, Dr. Travis considered: respondent's "offensive history[,]" including criminal behavior for which respondent was charged but not found guilty, as well as "nonsexual thinking patterns, nonsexual violence, how frequently he commits this offense, where those offenses are committed," and "patterns of behavior that are enduring, that are repetitive." The experts testified that the 1989 incident in prison and the 1993 cluster of offenses within a span of eight days were sexually motivated and demonstrated respondent's pattern of disregarding the rights of others. They also considered nonsexual crimes, incidents involving sexual misconduct while respondent was in custody, and other minor violations or warnings, as well as respondent's own explanations of some of these events as related in Dr. Abbott's report.

¶ 70    Dr. Abbott, on the other hand, testified that respondent's ASPD was completely remitted because of his age and his ability to follow the rules in custody. He admitted though that respondent

met the conduct disorder requirement and had the remaining symptom of "lack of remorse." He also admitted that there is a small percentage of individuals whose ASPD is a lifelong disorder regardless of age. Dr. Abbott's reliance on respondent's ability to follow the rules, however, was countered by the State's experts' testimony that (1) it is difficult to show impulsivity while in a controlled environment like prison and the TDF, (2) respondent had admitted that he was behaving so that he could be released, and (3) respondent did have some behavioral issues while in custody, as evidenced by the 2021 contraband violation, the 2010 personal letters sent to the nurse, the 2006 sexual misconduct with another inmate, and the 2014 incident where he grabbed a nurse's buttocks.

¶ 71 Additionally, Dr. Abbott disputed the validity of an OSPD Non-Consent diagnosis. He testified that OSPD Non-Consent has no "clearcut criteria" and that diagnosis has poor inter-rater reliability, which measures the extent to which evaluators agree on the diagnosis for the same patient. Dr. Abbott opined that this lack of "inter-rater reliability" is because there is no agreed upon criteria for diagnosis.

¶ 72 On this record, a reasonable factfinder could conclude that Drs. Travis and Bochenek credibly testified that respondent suffers from a qualifying mental disorder. The jury was free to reject Dr. Abbott's testimony that respondent's ASPD had fully remitted, where the State's experts testified that he could not be considered fully remitted while in a controlled environment. Additionally, the jury could accept Dr. Abbott's research on inter-rater reliability but still find that the State's experts' diagnoses, which were similar, were reliable. Although the experts had conflicting assessments of respondent, "the question of whether the weight of the evidence and the credibility of the witnesses proved that [respondent] was a sexually violent person was ultimately the responsibility of the jury." *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 62. The jury

was in the best position to determine whether the State's experts were more credible than Dr. Abbott, and we will not disturb that finding where respondent cannot show that no reasonable factfinder would have made that same determination. See *Fields*, 2014 IL 115542, ¶ 20.

¶ 73    Nonetheless, respondent contends that the experts did not "explain how [respondent's] diagnoses presently influence his emotional or volitional capacity thus predisposing him to commit acts of sexual violence." The record refutes this contention. Dr. Travis expressly testified that the mental disorders affected his emotional or volitional capacity because "all the brakes are off" and he has "tunnel vision" when he gets nonconsensual sexual urges, so he would not "consider things like long-term consequences or impact to other people." Dr. Travis further testified that respondent would be "out of control with that behavior" as a result of the mental disorders. Dr. Bochenek also testified that the mental disorders impacted respondent's emotional and volitional capacity. She testified that, emotionally, respondent's thought process would be that his behavior is "okay" and he can do what he wants to do, effectively "[j]ustifying it in [his] mind[,]" and, volitionally, respondent would act on those thoughts. As such, respondent's argument is meritless.

¶ 74    We also reject respondent's argument that the State failed to prove that substance use disorder is a qualifying mental disorder. Although Dr. Travis diagnosed respondent with substance use disorder, our conclusion would not change if that diagnosis had not been included in their evaluations. Dr. Travis testified that the disorder was "less essential to the question" and the disorder was "in full remission" but noted that respondent is in a controlled environment where he does not have access to those substances. Thus, it was not an integral part of his opinion that respondent qualifies as an SVP, which was made clear in his own testimony. The State's alleged failure to prove that such a disorder qualifies as a mental disorder would not alter our conclusion, and thus, respondent's contention on that point is immaterial.

¶ 75    Turning to the final element, respondent contends that the evidence was not sufficient to show that there was a substantial probability that he would reoffend as is required under the SVP Act. Specifically, respondent argues that the risk associated with the experts' scores on the instruments did not equate to a substantial probability of reoffense and the jury was left to guess as to how respondent's risk increased to the level of substantial probability. In response, the State points out that this court has found in other cases that the State had sustained their burden on this element with lower risk scores than those attested to by the experts in this case.

¶ 76    "Substantially probable means much more likely than not." (Internal quotations omitted.) *Gavin II*, 2019 IL App (1st) 180881, ¶ 43. This definition "cannot be reduced to a mere mathematical formula or statistical analysis." *In re Detention of Hayes*, 321 Ill. App. 3d 178, 188 (2001). "We do not require any specific, precise, or exact testimony to find that an expert sufficiently made the connection between the respondent's mental condition and risk of reoffense." *Montanez*, 2020 IL App (1st) 182239, ¶ 76.

¶ 77    Here, both of the State's experts conducted comprehensive risk assessments that considered actuarial risk scores, dynamic risk factors, and protective factors. Notably, both experts came to similar, though not identical, conclusions for each of these aspects of their assessments. In fact, all three experts scored respondent at a seven on the Static-99R, which placed respondent in the highest risk category. According to Dr. Travis, a score of seven is "associated with re-offending more than five times more often than what was considered to be the typical sex offender" and "[a] score of seven is also higher than 96 percent of all the guys on whom this instrument was normed." On the Static-2002R, Dr. Travis scored respondent at a six, which is the second highest risk category. At a six, respondent "is about three times more likely to sexually re-offend than a person who's considered to be a typical sex offender scoring a three on this instrument." This score

is "higher than 85 percent of the guys on whom the test was norm" and is associated with "being three times more likely to sexually re-offend" than "a typical sex offender scoring a three on this instrument." Dr. Bochenek scored respondent at a five, which is also in the second highest category for risk.

¶ 78     Both experts also testified that the developers for the Static instruments recommend considering other risk factors, although Dr. Bochenek acknowledged that some of the factors overlap with those on the Static instruments and the meta-analyses did not examine how "a combination of risk factors affects risk." Dr. Travis testified that it was difficult to assign dynamic risk factors to respondent without an interview, but none of the factors would "raise his risk" because he was already in the highest risk category. Dr. Bochenek assigned respondent the dynamic risk factors of deviant sexual interest, lack of intimate relationships with adults, resistance to rules, and impulsivity and a lack of behavioral control, which correspond to the underlying information she considered in forming her opinion. Neither expert found any protective factors that lowered respondent's risk of reoffending, particularly noting that respondent declined to engage in any sex offender treatment and his skin condition would not inhibit his ability to reoffend. As a result of their assessments, both experts opined that respondent was substantially probable to reoffend.

¶ 79     As stated above, Dr. Abbott also scored respondent at a seven on the Static-99R, which is in the highest risk category and has a five-year absolute recidivism risk of 24 percent, but he testified that the Static-99R overestimates the risk of recidivism by a factor of 1.73, and based on that overestimation, respondent's risk of recidivism was actually 14 percent. However, we note that, according to Dr. Travis, actuarial instruments underestimate the actual risk that a respondent will actually re-offend because they only consider charged offenses "but we don't know to what

degree." Dr. Abbott declined to consider any external risk factors and relied solely on the actuarial instrument in concluding that respondent was not substantially probable to reoffend.

¶ 80    A particular actuarial score is not required by the SVP Act for a factfinder to find beyond a reasonable doubt that a person is substantially probable to reoffend. See *Evans*, 2020 IL App (1st) 192293, ¶ 70. Further, this court has explicitly rejected the proposition that the State must prove a recidivism likelihood above 50% to meet this standard. *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶¶ 23-25. Here, all three experts gave respondent the same score, in the highest category for risk, on the Static-99R. They differed, however, in their opinions as to whether the instrument overestimates or underestimates an individual's recidivism risk. It is the jury's role to weigh conflicting expert testimony, and there is nothing in the record to suggest that it would be unreasonable to find the State's experts more credible than respondent's expert. Thus, we defer to the trier of fact on expert credibility and will not reweigh conflicting expert testimony. *Evans*, 2021 IL App (1st) 192293, ¶ 67. Viewing the evidence in the light most favorable to the State, a reasonable trier of fact could find beyond a reasonable doubt that respondent is substantially probable to commit future acts of sexual violence. *Haugen*, 2017 IL App (1st) 160649, ¶ 26 (affirming the finding on this element where expert witnesses relied on actuarial tests, as well as the respondent's criminal history and underlying behaviors).

¶ 81    Respondent's argument regarding this element relies almost exclusively on this court's nonprecedential order in *In re Commitment of McCormack*, 2021 IL App (1st) 181930-U, ¶¶ 40-42, which, according to respondent, reversed the trial court's finding that the respondent was an SVP on the basis that "the State's expert was unable to explain her conclusion that the respondent's risk of reoffense rose to the level of substantially probable." However, *McCormack* is inapposite as it involves markedly different facts.

¶ 82 In *McCormack*, the State's expert found the respondent to have a "statistically 'average risk' of reoffending" based on diagnostic instruments as he scored a 3 on the Static-99R, which is associated with only an 8-10% chance of recidivism after five years. *Id.* ¶¶ 12, 28. The expert concluded that, based on her evaluation of dynamic factors as well, it was substantially probable that the respondent wound reoffend. *Id.* ¶¶ 12, 29. On appeal, this court concluded that the State "left too much to inference" when questioning the expert and that the expert never provided an explanation for why the respondent's risk of reoffense was substantial. *Id.* ¶ 42. Additionally, the court, as the trier of fact, erroneously relied upon factors outside the actuarial assessments in making its determination. *Id.* ¶¶ 22-23. In contrast, here, all experts opined that respondent's score of seven on the Static-99R landed him in the "above average risk" category, which is associated with a 24% chance of recidivism over five years and 33% over ten years. Just based on that factual difference between this case and *McCormack*, we would conclude that the cases are not comparable. But also, the trier of fact here was the jury, not the trial court, and we cannot know which factors, assessments, research, etc., that it relied upon in coming to its decision. As such, there is no reason for this court to conclude that the jury's decision was erroneous, where there was sufficient to evidence for a rational factfinder to conclude that respondent was substantially probable to reoffend. See *In re Commitment of Jackson*, 2023 IL App (1st) 221303-U, ¶ 68 (distinguishing *McCormack* because the respondent was tried by a jury); *In re Commitment of Holt*, 2022 IL App (1st) 210402 (distinguishing *McCormack* based on substantially different actuarial scores).

¶ 83 In a motion to cite additional authority, which this court granted, respondent also posited that the recently issued decision in *In re Commitment of Gavin* (*Gavin III*), 2024 IL App (1st) 230246, supports his argument that the State did not prove beyond a reasonable doubt that he was

substantially probable to sexually reoffend. In that case, the respondent's petition for discharge proceeded to a jury trial where the jury decided that he remained an SVP. *Id.* ¶ 9. On appeal, this court reversed, finding that the State failed to prove that respondent was substantially probable to reoffend because the State's expert's testimony was "internally conflicting" and "at times, absent rationale." *Id.* ¶¶ 4, 69. Notably, because the appeal stemmed from the respondent's petition for discharge, the State's burden of proof was clear and convincing evidence and the court reviewed the jury's decision for manifest error. *Id.* ¶¶ 44-45. Although clear and convincing is a lesser burden than reasonable doubt, the court nonetheless concluded that the State failed to prove that the respondent was substantially probable to reoffend. *Id.* ¶ 71. The court's conclusion that the jury's decision was manifestly erroneous was based on the State's expert's testimony which was "arbitrary and not based on the evidence" and "internally conflicting or, at times, absent rationale." *Id.* ¶¶ 66, 69. The court noted that the expert scored the respondent as an eight on the actuarial instruments while computing the respondent at the age of his condition onset (37 years old), rather than his current age of 64, and then the expert admitted that if he was scored at his current age, his score would be a 5 or 6. *Id.* ¶¶ 49-51. Additionally, the court also took issue with the expert's determination that the respondent's age and physical infirmities were not protective factors but the expert had no training in the effects of physical conditions on the risk of reoffending and he failed to consult with physicians. *Id.* ¶ 68. As we have shown above, the State's experts' testimony was neither arbitrary nor absent rationale. Drs. Travis and Bochenek supported their conclusions with underlying information in the record and were well-versed in the use of actuarial instruments and risk factors, and, unlike the expert in *Gavin III*, they did not "undercut" their own assessments. See *id.* ¶ 47. Finally, respondent here is younger than the respondent in *Gavin III* and does not

suffer from any physical infirmities that would inhibit his ability to reoffend. For these reasons, we find *Gavin III* distinguishable.

¶ 84    In conclusion, we reject respondent's challenge to the sufficiency of the evidence. See *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 602-03 (2007) (upholding the jury's finding that the respondent was an SVP based on expert testimony).

¶ 85                                    B. Evidentiary Ruling

¶ 86    Second, respondent briefly argues that the trial court abused its discretion in permitting testimony that two of respondent's sexually violent convictions were initially vacated on appeal. In response, the State contends that the evidence is relevant because details of respondent's criminal history informed the experts' opinions.

¶ 87    "All relevant evidence is admissible except as otherwise provided by law." Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant here, "[t]he underlying facts reasonably relied upon by an expert witness are admissible and subject to comment for the purpose of explaining the basis for the expert witness's opinions." *In re Commitment of Moore*, 2013 IL App (5th) 170453, ¶ 102.

¶ 88    Here, the appellate history of respondent's convictions was both relevant and permissible evidence for the experts to consider. That history is simply part of respondent's criminal history, which the experts considered in its entirety. Anything the experts reasonably relied upon for their evaluation of respondent is relevant and can be presented to the jury. Thus, we reject respondent's argument that the testimony was improper and irrelevant.

¶ 89    Nonetheless, respondent claims that the appellate history may have led the jury to believe that its verdict was "of diminished significance" and could be easily corrected on appeal. His support for this contention rests on the United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). There, the prosecutor informed the capital sentencing jury that there would be automatic review of its decision by the state supreme court and stated that it was "unfair" that the defense "would have [them] believe that [they're] going to kill this man" when "they know that [their] decision is not the final decision." *Id.* at 325-26. The Supreme Court vacated the jury's sentence of death because "the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death." *Id.* at 341. The Court emphasized the impropriety of the remarks, stating that they were "quite focused, unambiguous, and strong." *Id.* at 340.

¶ 90    We do not find the circumstances in *Caldwell* analogous to those before us. The alleged improper statements here were not part of the prosecutor's closing arguments; rather, the statements were part of the expert's testimony in laying out all that was considered in reaching his opinion that respondent is an SVP. As we have stated above, the testimony was both relevant and admissible. In contrast to the remarks in *Caldwell*, the testimony was neither explicitly nor even implicitly used to highlight the appellate review process or the lack of finality of a jury's decision. As such, the Supreme Court's decision in *Caldwell* does not alter our conclusion that the testimony was proper. The cases from Kansas and Mississippi which respondent cites, *State v. Henderson*, 226 Kan. 726 (1979), and *Howell v. State*, 411 So.2d 772 (1982), are similarly inapposite. In both of those cases, the prosecutor in closing argument made a direct and unambiguous statement to the jury that, if their verdict to was erroneous, it could be corrected on appeal, and the state supreme court in each case found the argument improper. *Henderson*, 225 Kan. at 737; *Howell*, 411 So.2d

at 773-74, 777. The impropriety and potential prejudicial impact in those cases is obvious but they have no bearing on the distinguishable circumstances here.

¶ 91    Additionally, "[a]bsent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *People v. Wilmington*, 2013 IL 112938, ¶ 49. Respondent points to nothing in the record that would suggest that the jurors were unable or unwilling to follow the court's instructions or that they did not understand their responsibility as jurors. It should also be noted that Dr. Travis's references to the appellate court's rulings on the convictions were brief and neither party dwelled upon that procedural history such that it was given any undue weight. As such, we find that the trial court did not abuse its discretion in allowing this testimony.

¶ 92                                 C. Closing Arguments

¶ 93    Third, respondent argues that the trial court erred in its rulings on the scope of closing arguments, and the State's closing and rebuttal arguments denied him due process. Respondent challenges several of the State's remarks and also asserts that the trial court improperly sustained some of the State's objections to his own closing argument. The State responds that all of the trial court's rulings were proper and respondent was not denied a fair trial.

¶ 94    " 'The purpose of closing arguments is to give the parties a final opportunity to review with the jury the admitted evidence, discuss what it means, apply the applicable law to that evidence, and argue why the evidence and law compel a favorable verdict.' " *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005) (quoting T. Mauet & W. Wolfson, Trial Evidence 439 (2d ed. 2001)). The prosecution is "afforded wide latitude in making closing arguments so long as the comments made are based on the evidence or reasonable inferences drawn therefrom." *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 30. Closing arguments must be viewed in their entirety, and "the

challenged remarks must be viewed in context." *Nicholas*, 218 Ill. 2d at 122. Where the offending remarks are "isolated," there is no violation to a defendant's right to a fair trial. *Id.* at 123.

¶ 95    "The trial court has discretion to determine the proper character, scope and prejudicial effect of closing arguments." *People v. Kliner*, 185 Ill. 2d 81, 151 (1998). " 'We will not interfere with the trial court's determination of the propriety of the prosecution's closing argument absent a clear abuse of discretion resulting in manifest prejudice to the defendant.' " *In re Commitment of Gavin (Gavin I)*, 2014 IL App (1st) 122918, ¶ 49 (quoting *People v. Willis*, 2013 IL App (1st) 110233, ¶ 102). Reversible error only occurs when a prosecutor's comments result in "substantial prejudice" against the defendant to the extent that "it is impossible to determine whether the verdict of the jury was caused by the comments or by the evidence." *Willis*, 2013 IL App (1st) 110233, ¶ 102.

¶ 96                    1. The State's Closing and Rebuttal Arguments

¶ 97    We consider each of respondent's challenges in turn. First, he contends that the State improperly "diminished the burden of proof and improperly defined reasonable doubt by analogy." According to respondent, the State's analogy and the court's overruling of respondent's objections "caused substantial prejudice" to respondent and thus a new trial is required.

¶ 98    During closing argument, the State compared the burden of proof to a racecar and a circular racetrack. The analogy was presented as follows:

> "Ladies and gentlemen, [respondent's counsel] spent a long time talking to you about our burden. We are not shirking our burden here. Our burden is beyond a reasonable doubt, and it's as to three elements. I want you to think about this burden like you are a spectator at a racetrack. *** Every time they finish a lap, one, two, three. This case only has three laps. It has three elements. Our job is to prove that our car crossed the finish line

on each lap. *** That it completely finishes the lap, not that it fell short of the finish line. Respondent's attorneys and Dr. Abbott are here to kick up dust to prevent you as the spectator from seeing whether or not our car[.] *** While you're watching this race, these are obviously distractions that are occurring. I want you to stay focused *** on the car, our car as it goes around the circle, one, two, three."

¶ 99    Respondent's argument that this analogy was improper largely relies on *People v. Jenkins*, 89 Ill. App. 3d 396 (1980). There, the trial court defined reasonable doubt to the jurors by using the following analogy concerning a glass of water:

"By way of example, I'll use this glass of water. If you can see the glass without this rubber band about it. That rubber band represents beyond a reasonable doubt. The defendant is like a chip of wood in the bottom of the glass. In order to prove the defendant guilty, the State must pour in enough water to float the defendant to the line of reasonable doubt, represented by the rubber band.

If they don't float the defendant that high then they fail and you must find the defendant not guilty. If they float the defendant to that line, then they have met their burden of proof beyond a reasonable doubt. And you must find her guilty. You must not require the State to fill the glass. They don't have to prove it to a mathematical certainty. But to a reasonable doubt. I hope the illustration is helpful to you. It is a sometimes confusing concept. And I want to be sure you understand it before we go on."

*Id.* at 396-97. The prosecutor in *Jenkins* also used this analogy during its argument to the jury: "But all we have to do is fill up the glass, like the judge showed it. We don't have to make it overflow, and overflow, and overflow." *Id.* at 397. Considering the issue for plain error, this court held that the trial court's instruction to the jury was reversible error and "the prejudice to [the]

defendant was compounded by the prosecutor's use of the trial court's analogy[.]" *Id.* at 398. In doing so, the court stated that "the court's attempt to explain reasonable doubt was in itself improper" because "the concept of reasonable doubt needs no explanation." *Id.* The court also concluded that the analogy was improper because it "was based upon an inapposite comparison of the term [reasonable doubt] to a glass of water" and it "emphasized the quantity of evidence introduced by the State without taking into account the evidence introduced by the defendant or the credibility of the witnesses." *Id.*

¶ 100    Respondent contends that the State's analogy here was similar to the one found improper in *Jenkins* and it even went further than the analogy in *Jenkins* because "it mischaracterized and obscured the role of defense counsel and Dr. Abbott in the proceedings as attempting to kick up 'dust' and 'distractions' to prevent the jury from seeing whether the car finished a circular lap."

¶ 101    We disagree and find *Jenkins* neither analogous nor instructive on this issue. First, the State's analogy did not attempt to define reasonable doubt, nor did the analogy seem to concern the burden of proof, except that the State was required to prove three elements, which is true. Second, unlike in *Jenkins*, the analogy was given only during the State's closing argument, not by the court as a part of its jury instructions, a distinction that cannot be ignored. The jury was instructed multiple times that closing arguments are not the law and all instructions on the law will come from the judge. This admonishment was also given after the court sustained respondent's objection. We have no reason to believe that the jury ignored the court's instruction. See *Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them."). Finally, we note that the fact that the prosecutor provides examples to illustrate the application of the law to the facts is not inherently improper so long as "the prosecutor correctly states the law[.]" *People v. London*, 256

Ill. App. 3d 661, 665 (1993); see also *People v. Nunn*, 357 Ill. App. 3d 625, 639 (2005); *People v. Gill*, 2023 IL App (1st) 201109-U, ¶ 56. To the extent that the State's suggestion that the defense's role was to "kick up dust" on the racetrack was an inaccurate statement of law, the court properly sustained the objection and admonished the jury. See *People v. Wheeler*, 226 Ill. 2d 92, 128 ("[T]he act of sustaining an objection and properly admonishing a jury is generally sufficient to cure prejudice engendered by improper closing argument."). Thus, we do not find that the analogy resulted in substantial prejudice to respondent. See *London*, 256 Ill. App. 3d at 664 ("To merit reversal, the improper remarks must result in substantial prejudice to defendant.").

¶ 102 Respondent also separately challenges the State's remark that it was respondent's job to "kick up dust" to prevent the jury from seeing whether the State's "car" finished the race. Respondent characterizes these remarks as attacks on respondent's counsel and Dr. Abbott, claiming that the prosecutor "improperly denigrated" them. He further argued that the court's sustaining of the objection was "insufficient to cure the error" because the court allowed the State to continue this line of argument.

¶ 103 We would not characterize the "kick up dust" remark as an "attack" or "denigration" of counsel. Improper closing argument statements include suggestions that " 'defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury.' " *People v. Kidd*, 147 Ill. 2d 510, 542 (1992) (quoting *People v. Emerson*, 97 Ill. 2d 487, 497 (1983)). The State's remark does not fall in any of those categories and cannot otherwise be characterized as "egregious" (*In re Commitment of Tenorio*, 2020 IL App (1st) 182608, ¶ 49) or "pervasive and inflammatory" (*Jackson*, 2023 IL App (1st) 221303-U, ¶ 82); see *Gavin I*, 2014 IL App (1st) 122918, ¶ 59 (finding that the prosecutor's remark that the respondent's argument was "twisting and disingenuous" may have been "unprofessional," but it did not convey "a prejudicial

connotation"). Rather, this was an isolated remark, the objection to which was properly sustained by the court and which, again, prompted the court's admonishment that "arguments of lawyers are not to be taken as statements of law." See *Kliner*, 185 Ill. 2d at 159 ("Such instructions can serve to alleviate any possible prejudice from an erroneous closing comment by the State."). The remainder of the State's argument on this point did not name either respondent's counsel or expert but instead stated generally that the jury should ignore "distractions" and "stay focused," effectively meaning that the jury should remain focused on the three elements that the State needed to prove beyond a reasonable doubt. See *People v. Hudson*, 157 Ill. 2d 401, 443 (1993) (prosecutor's argument that defense theory was "laughable" did "not sufficiently refer to defense counsel or attribute any particular wrongdoing to him"). As such, we do not find that the remark resulted in prejudice to respondent.

¶ 104 Next, respondent contends that the State improperly highlighted basis of opinion testimony "as if it were substantive evidence that had been admitted for its truth."

¶ 105 "It is well-settled that an expert may give opinion testimony that relies on facts and data not in evidence, as long as the underlying information is of the type reasonably relied on by experts in the particular field." *Tenorio*, 2020 IL App (1st) 182608, ¶ 43 (citing *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51). It is imperative that the presentation of the underlying facts and data be limited to explaining the basis for the expert's opinion and the basis "must not be presented to the jury as substantive evidence of the underlying assertions." *Id.* ¶ 44.

¶ 106 According to respondent, the following portions of the State's argument, to which respondent contemporaneously objected, were improper as related to the basis of opinion testimony.

"Doctors Travis and Bochenek explained the process they went through, a thorough records review, which included going over [r]espondent's criminal history, which the [d]octors relied on before, and that helps determine -- you can use that to help determine their credibility in their diagnosis and risk assessment.

They started with this 1989 criminal case where he was in prison for stealing a woman's car and dragging her along as he fled. While in prison, he laid and waited for a female prison staff member to be alone. He wore a garbage bag for a hood[.]

* **

He choked her, dragged her down the hallway to the bathroom, and as he continued to choke her, he decided to kiss her, too. She fought back and was able to escape. Respondent was convicted in that case. The Respondent issued -- demonstrated no remorse there. When he was asked about it by Dr. Abbott, he stated that the employee came upon him and tried to grab him. He doesn't explain how she got the bruising, though. Then the next series of offenses that the doctors considered came in 1993 when the [r]espondent was out for two months. In that case, there is a cluster of offenses all involving the same pattern of behavior. You heard how that demonstrated impulsivity, a lack of control by the respondent.

The first offense took place on December 14th, 1993. There, the victim was taking the early morning bus home, and prior to getting on the bus, the [r]espondent approached her, said it was a stickup, and pointed a pistol at her [head]. He forced her into a garage, threatened to kill her, and vaginally raped her. Furthermore, he decided to punch her in the face because she was crying too much.

***

And what did he say about the offense? That he robbed the victim because he was rebuffed, and she told him he could do what he wanted with her because she didn't have money. Then we go on to the December 16th sexual assault that the experts considered. There, the victim was walking alone. The [r]espondent again states that it's a stickup. He points a pistol at her, he threatened to kill her, he forced her into a garage, and forced her to fellate him. Then he ordered her to undress and vaginally raped her.

\*\*\*

In both of those two offenses, the respondent was convicted of aggravated criminal sexual assault. Then there was the December 22nd criminal assault, which the experts considered because the pattern of behavior was the same, and as in the other cases, the victim identified the respondent. There again, there was a statement that it was a stickup, he grabbed her neck, he pointed a gun at her back and pushed her in the garage, forced her to fellate him, and then he attempted to anally rape[ ] her, and then he vaginally raped her. Ultimately, in that case, he was found not guilty."

¶ 107   This record shows that the State properly prefaced their remarks by noting that Dr. Travis and Dr. Bochenek based their opinions on a "thorough records review." Additionally, the State stated twice that the experts "considered" each incident, which, in this court's view, appropriately conveyed to the jury that the State was reciting the incidents upon which the experts relied in forming their opinion. The State did not attempt to exceed the limits of basis of opinion testimony. Regardless, to the extent that there was any error in the manner the State presented the evidence, the trial court admonished the jury several times that the evidence was admitted for the limited purpose and was not to be considered as substantive evidence. See *Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set

forth in the instructions given them."). Our review of the record shows that the State's argument was not presented in a manner to clearly flout the court's instruction or mislead the jury as to the purpose of the testimony. As such, we conclude that the State's presentation of the basis of opinion evidence was not improper, and the trial court did not abuse its discretion in overruling respondent's related objections. See *Butler*, 2013 IL App (1st) 113606, ¶ 34 (no error where "the State argued the facts and circumstances of [the] respondent's history of violent sexual offenses as having been relied upon and completely supporting the opinions of their expert witnesses"); *Tenorio*, 2020 IL App (1st) 182608, ¶ 47 (no error where the State "recited the details of [the] respondent's prior offense in the context of describing that pattern").

¶ 108 We also reject respondent's reliance on *People v. Murphy*, 157 Ill. App. 3d 115 (1987), and *Gavin I*, 2014 IL App (1st) 122918. In *Murphy*, which was a criminal case involving the defense of insanity and self-defense, a divided panel of this court found that the State had improperly elicited testimony from a defense expert witness regarding the contents of a social history report that included statements from the defendant's mother that tended to negate the defendant's affirmative defenses. *Id.* at 116-20. In finding reversible error, the court found that the mother's statements were not sufficiently reliable to be admissible. *Id.* at 119. However, *Murphy* is not relevant here where respondent has not asserted that any of underlying information relied upon by the experts was not reasonably relied upon. Rather, he asserts that the State repeated the experts' testimony as substantive evidence, rather than as basis of opinion testimony, and we have found that argument meritless above.

¶ 109 *Gavin I* is also distinguishable. There, the respondent asserted that the State argued the facts of his sexual offenses as substantive evidence, and this court agreed, finding that the prejudicial impact of the prosecutorial errors mandated a new trial. *Id.* ¶¶ 67, 80. In coming to this

conclusion, the court pointed to the State's statements that "the experts were going to 'tell' or 'show' the jury about [the respondent's] past sex crimes" and repeated references "to these hearsay statements as 'facts' and 'evidence.' " *Id.* ¶ 73. Additionally, the court noted that the State argued the facts underlying the respondent's convictions as a "narrative[,]" which "misdirected the focus of the case, disconnecting the underlying facts and the experts' use of them." *Id.* ¶ 74. The court determined that this prosecutorial misconduct rose to the level of substantial prejudice because there were "strong reasons to disregard the experts' opinions." *Id.* ¶ 76. Those "reasons" included the experts' assumptions regarding the respondent's medical records, "which they had no training interpreting[,]" their refusal to consider as a protective factor the respondent's ailments which limited his mobility, and their admission that "they did not believe [the respondent] had committed any sexually deviant behavior" in 21 years. *Id.* ¶ 76.

¶ 110 In contrast, here, as we have stated, the State repeatedly prefaced that the experts "considered" the underlying facts in forming their opinion and referenced the "pattern of behavior" that supported the experts' opinions. This sufficiently indicated the limited use of the underlying information. Second, unlike *Gavin I*, the record in this case does not indicate that there were "strong reasons" to disregard the experts' opinions. Thus, both of respondent's cases to support his argument are inapposite.[1]

---

[1] In his reply brief, respondent argues that "the State's reliance on a 'pattern of behavior' in support for its use of basis of opinion testimony for the truth of the matter asserted lacks merit" and cites the recent United States Supreme Court decision, *Smith v. Arizona*, 602 U.S. 779 (2024). Although we recognize that the Court expressed some general criticisms of basis of opinion testimony in that case, it specifically held that "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." *Id.* at 783. Additionally, there, the defendant specifically asserted that the expert's testimony of the analyst's factual assertions violated the Confrontation Clause, which is not at issue here. Unless or until the Supreme Court, or our own supreme court, outlaws basis of opinion testimony or alters its use, we will continue to follow the precedential authority in this jurisdiction as well as the rules of evidence and Illinois pattern instructions on expert testimony.

¶ 111  For these reasons, we reject respondent's arguments that the State's closing argument resulted in prosecutorial error.

¶ 112                          2. Respondent's Closing Argument

¶ 113  Respondent also argues that the trial court abused its discretion in sustaining several of the State's objections during his closing argument. Specifically, the State's objections related to the following remarks: (1) Dr. Bochenek's opinion was "not reasonable and you do not have to accept it"; (2) Dr. Travis embellished the basis of his opinion by claiming that respondent had received a violation in DHS when in fact the records showing only a warning; (3) had respondent engaged in misconduct on the DHS gym there would have been a record showing a behavioral violation; and (4) the jury should consider Dr. Bochenek's analogy of the risk factors in this case as being "two sides of the same coin" and "if you flip a coin, would you say it's much more likely than not to land on heads versus tails?".

¶ 114  First, the court sustained the State's objection to respondent's remarks that Dr. Bochenek had "ma[de] up nonconsensual activity to support her opinion" and therefore Dr. Bochenek's opinion was "not reasonable and you do not have to accept it." The State argues that these remarks were "improper and unwarranted attacks" on Dr. Bochenek's integrity. "The credibility of a witness is a proper subject for closing argument if it is based on the evidence or inferences drawn from it." *Hudson*, 157 Ill. 2d at 445. Respondent's commentary on Dr. Bochenek's opinion and the basis thereof was proper; however, the implication that she fabricated some of respondent's behavior to support her opinion certainly pushes the boundaries of the wide latitude afforded during closing arguments. Thus, the trial court's decision to sustain the State's objection was not arbitrary, fanciful, or clearly unreasonable. Just as the trial court properly sustained respondent's

objection to the State's "attack" on respondent's counsel and expert, the trial court also properly sustained respondent's "attack" on the State's expert.

¶ 115   Second, the court sustained the State's objection to counsel's remark that Dr. Travis's testimony on direct examination that respondent received a minor violation was "an embellishment" because he later admitted on cross-examination that respondent only received a warning. It appears clear from the record that Dr. Travis's error was not intentional and, in any case, was corrected upon cross-examination, and it did not call for, to use respondent's phrase, "a denigration of counsel." Thus, we agree with the court's decision to sustain the objection.

¶ 116   Third, respondent sought to minimize the incident where respondent changed his clothes at the gym in front of others, including a therapist, by stating: "I think you can believe or understand that if what Mr. Mitts did was wrong, he probably would have received a ticket." The court sustained the State's objection to that remark. We find this reasonable and not an abuse of discretion where it was improper for respondent to make a value judgment that the behavior was proper, especially where the incident had only occurred a week prior to the trial and there did not appear to be a complete record for the experts to review regarding the incident. Finally, the remark could be considered misleading because there is no requirement that all behaviors considered by the experts be accompanied by findings of guilt, tickets, warnings, etc. See *Moore*, 2023 IL App (5th) 170453, ¶ 85 ("experts may discuss a respondent's sexual or nonsexual behavior, even if it did not result in a conviction"). Thus, we conclude that the trial court did not abuse its discretion.

¶ 117   Finally, the court properly sustained the State's objection to respondent's rhetorical question: "If you flip a coin, would you say it's much more likely than not to land on heads versus tails." We first reject respondent's contention that this remark should have been allowed because Dr. Bochenek was permitted to use the "two sides of the same coin" analogy. Dr. Bochenek used

that phrase to indicate that two factors were actually nearly identical to each other, whereas respondent used the coin analogy to discuss probability ratios. These are distinct uses of the "coin" and cannot be conflated as respondent suggests.

¶ 118   Nonetheless, in *In re Commitment of Collins*, 2022 IL App (1st) 201010-U, this court specifically found such remarks improper. There, during cross-examination, the respondent's counsel asked the State's expert: "If you were to flip a coin, would you say that's much more likely than not to land on heads?" *Id.* ¶ 80. The trial court sustained the State's objection to that question, and this court concluded that it was not an abuse of discretion to do so. *Id.* In particular, this court likened the question to asking the expert to affix a percentage to "substantial probability," which has repeatedly been found to be inappropriate. *Id.* ¶¶ 81-82 (citing cases rejecting the reduction of the term "substantially probable" to a mathematical formula or statistical analysis). We see no reason to depart from this rationale in *Collins*.

¶ 119                                    D. Jury Instructions

¶ 120   Fourth, respondent contends that the court's denial of his requested instructions was reversible error. Specifically, respondent maintains that (1) the court should have allowed respondent's out-of-jurisdiction pattern instruction (respondent's Instruction 5A) to replace IPI 2.04, and (2) the court erred in rejecting respondent's Instruction 23.

¶ 121   A trial court's choice of jury instructions is reviewed for abuse of discretion. *Butler*, 2013 IL App (1st) 113606, ¶ 45. "An abuse of discretion occurs only where the court's ruling is 'arbitrary, fanciful or unreasonable, or where no reasonable person could take the view adopted by the trial court.' " *Id.* (quoting *People v. Rodriguez*, 387 Ill. App. 3d 812, 821 (2008). "Whether a court abused its discretion depends on whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Curi v. Murphy*, 366 Ill. App.

3d 1188, 1199 (2006). Even faulty instructions will not constitute reversible error "unless the instructions clearly misled the jury and resulted in prejudice to the defendant." *People v. Polk*, 407 Ill. App. 3d 80, 108 (2010).

¶ 122   First, we find that the trial court did not abuse its discretion in instructing the jury in accordance with IPI 2.04 and declining to substitute respondent's proposed instruction from Washington. Trial courts should give an applicable pattern instruction "unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013); see *People v. Danielly*, 274 Ill. App. 3d 358, 367 (1995) ("Whenever applicable, an [IPI instruction] should be used whenever it accurately states the law"). In giving IPI 2.04, the court stated:

> "The testimony is limited—is allowed for a limited purpose. It is allowed for the witness may tell you what he relied on in forming his opinion. The material being referred to is not evidence in this case. It may not be considered by you as evidence. You may consider the material for purpose of deciding what [weight], if any[,] [y]ou will give opinions testified by this witness. You may hear that again during the course of his testimony."

Whereas, the instruction from Washington provided as follows:

> "Generally, witnesses testify only to things they observe. However, some witnesses are permitted to give their opinions in addition to their observations. In order to assist you in evaluating an opinion, a witness may be allowed to give the basis for the opinion. In some circumstances, testimony about the basis for an opinion is not appropriate for you to consider for other purposes. In that instance, I will call to your attention the limited purpose for which the evidence may be properly considered.

(Name of witness) [is about to testify] [has testified] regarding (identify nature of testimony), which is part of the basis for [his] [her] opinion. You may consider this testimony only in deciding what credibility and weight should be given to the opinions of (name of witness). You may not consider it as evidence that the information relied upon by the witness is true or that the events described actually occurred."

¶ 123   According to respondent, IPI 2.04 "does not preclude the jury from considering the [basis of opinion] testimony for its truth" and the instruction fails to explain what it means to not consider basis of opinion testimony as evidence. Respondent cites *Gavin I*, 2014 IL App (1st) 122918, and *Montanez*, 2020 IL App (1st) 182239, for their criticisms of basis of opinion testimony.

¶ 124   In *Gavin I*, as we set forth above, the respondent challenged the State's closing arguments regarding the basis of opinion testimony. 2014 IL App (1st) 122918, ¶ 67. This court found that the State's argument was presented in a way that rebutted the presumption that IPI 2.04 was followed. *Id.* ¶ 78. In doing so, the court noted that "[t]he jury was properly instructed" when it was given IPI 2.04 but "acknowledge[d] that this instruction, in some circumstances, is confusing" and set forth criticisms of basis of opinion testimony from a treatise on evidence. *Id.* (citing David H. Kaye *et als.*, The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.7.2 (2d ed. 2010)).

¶ 125   In *Montanez*, the respondent claimed that the trial court improperly considered the basis of the experts' testimony for its truth as substantive evidence. 2020 IL App (1st) 182239, ¶ 79. This court discussed at length the practical realities of basis of opinion testimony. The court stated that "the distinction between evaluating the expert's basis evidence merely to determine how much to credit the expert opinion *** and determining the truth of those underlying facts" is "extremely subtle and exceedingly difficult, in practice, to apply." *Id.* ¶¶ 94-95. The court continued: "It is

nearly impossible, in most instances, for a factfinder to determine the reliability of underlying facts without also determining whether those underlying facts are true. And if the factfinder determines that the underlying facts are true, it is even harder to imagine how that factfinder can wall off that finding." *Id.* ¶ 95. Ultimately, the court found that there was sufficient indication in the record "to demonstrate that the trial court was considering the facts and circumstances of [the] respondent's history in the context of having been relied upon and supporting the expert's opinion." *Id.* ¶ 108.

¶ 126    However, the respondent in *Montanez* had a bench trial and thus jury instructions were not at issue. And, the court in *Gavin I* explicitly recognized that the trial court "properly instructed" the jury when it gave IPI 2.04. *Gavin I*, 2014 IL App (1st) 122918, ¶ 98. Thus, although the panels in *Gavin I* and *Montanez* express valid criticisms of basis of opinion testimony, neither court outright proscribed, or even truly addressed, the use of IPI 2.04 or suggested that it does not accurately state the law.

¶ 127    Instead, despite respondent's urging that it was wrongly decided, we follow *Jackson*, 2023 IL App (1st) 221303-U. There, the respondent requested that the court give the same Washington instruction in lieu of IPI 2.04, arguing that IPI 2.04 does not accurately state the law regarding consideration of basis of opinion testimony. *Id.* ¶¶ 90, 94. On appeal, this court reviewed the same criticisms of basis of opinion testimony found in *Gavin I* and *Montanez* and concluded that neither case provided support for the respondent's claim that IPI 2.04 does not accurately state the law. *Id.* ¶¶ 98-99. As a result, the court concluded that IPI 2.04 correctly states the law applicable to the consideration of such testimony and it was not an abuse of discretion for the trial court to refuse to give the Washington instruction. *Id.* ¶ 100. Respondent provides us no reason to depart from the decision in *Jackson*. Thus, we conclude that it was not error for the trial court to refuse to give the jury respondent's non-IPI instruction.

¶ 128　Next, the court properly rejected respondent's Instruction 23. This instruction stated: "Evidence that the Respondent was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the person has a mental disorder." Respondent contends that this proposed instruction is based on section 35(e) of the SVP Act and was "accurate, simple, brief, impartial, and nonargumentative." That section is nearly identical to the proffered instruction. See 725 ILCS 207/35(e) (West 2018). According to respondent, this principle is fundamental to SVP cases.

¶ 129　As the State points out, this court has considered and rejected an identical challenge in *In re Commitment of LaRue*, 2021 IL App (1st) 200858-U. There, the respondent argued on appeal that the trial court abused its discretion when it denied his request for a nonpattern jury instruction that mirrored the language of section 35(e) of the SVP Act. *Id.* ¶ 63. In finding no abuse of discretion, this court explained that the instruction was not necessary because "the State did not rely solely on [the] respondent's prior sex offenses as evidence to establish that [the] respondent had a mental disorder" and agreed with the trial court that "the instruction had the potential to confuse the jurors[.]" *Id.* ¶ 72. Similarly, here, both of the State's experts relied on respondent's prior sex offenses, as well as his medical history, his failure to complete sex offender treatment, his age, his substance use, his nonsexual behavior, and his history of warnings, violations, etc., while incarcerated. The experts also relied on the DSM-V to support their mental disorder diagnoses. Additionally, like in *LaRue*, the trial court found the instruction would confuse the jurors. We see no reason to depart from the reasoning in *LaRue* and conclude that the trial court did not abuse its discretion in declining respondent's request for the nonpattern instruction.

¶ 130　Additionally, we do not find the cases that respondent cites for support instructive on this issue. In *People v. Pegram*, 124 Ill. 2d 166, 173 (1988), our supreme court reversed and remanded

for a new trial where the jury was not instructed as to the defense of compulsion. However, in *Pegram*, there were criminal pattern instructions available for the defense of compulsion and the State's burden of proof with respect to the defense, and the supreme court actually found that defense counsel was ineffective for not requesting jury instructions on compulsion. *Id.* at 171-72, 174. In *People v. Ogunsola*, 87 Ill. 2d 216, 221 (1981), our supreme court reversed and remanded where the jury was not instructed on the definition of "intent to defraud" in a deceptive practices prosecution. The supreme court noted that the legislature had amended the crime of deceptive practices to include the additional element of "intent to defraud" but the Illinois Pattern Instruction on the offense had not been revised in accordance with the amendment until after the jury trial took place. *Id.* at 220-21. The court found that the jury should have been instructed as to one of the essential elements of the crime. *Id.* at 221-22. Although both cases are factually distinguishable in a number of ways, most significantly, in both cases, the omitted instruction related to an issue central to the criminal trial, either an element of the crime or a defense to the crime. *Pegram*, 87 Ill. 2d at 173-74; *Ogunsola*, 87 Ill. 2d at 223. We would not characterize the principle set forth in section 35(e) as a central issue in determining whether an individual is an SVP. Rather, it is a collateral issue. Without it, the jury still had all of the instructions necessary to determine whether respondent was an SVP. Thus, it was not reversible error for the trial court to refuse to give this instruction.

¶ 131    Finally, respondent generally asserts that the jury instructions misled the jury. We disagree. The instructions clearly conveyed the law regarding the distinct elements to determine whether an individual is an SVP, the State's burden of proof, and the jury's prerogative to accept or reject the experts' opinions. As such, we find that the trial court accurately informed the jury of the applicable law and committed no error in its instructions.

¶ 132                                    E. Cumulative Error

¶ 133   Finally, respondent contends that "the individual and cumulative effects of the multiple errors" denied respondent his right to a fair trial and this court should reverse and remand for a new trial. In the prior sections of our analysis, we have not found any error by the trial court. Thus, there can be no cumulative error. See *People v. Peterson*, 2017 IL 120331, ¶ 131 ("Having rejected defendant's claims of error, we need not consider defendant's argument that cumulative error denied him a fair trial.").

¶ 134                                    III. CONCLUSION

¶ 135   For the reasons stated, we affirm the judgment of the circuit court.

¶ 136   Affirmed.